# CITY OF WOODBURN v. DOMOGALLA

Richard F. May, Woodburn, tried the case for plaintiff. On the briefs were Eichsteadt, Gutzler and May, and Richard F. May, Woodburn.

Hattie Bratzel Kremen, Marion County District Attorney, tried the case and submitted a brief for defendant.

Decision for plaintiff rendered April 30, 1963.

PETER M. GUNNAR, Judge.

*This is a proceeding in mandamus. Upon the petition of the City of Woodburn, this court issued an alternative writ of mandamus, requiring the assessor of Marion County to extend a levy for street lights in Woodburn upon the assessment and tax rolls of Marion County against the taxable properties within the City of Woodburn or to show cause why he should not be required to do so. The assessor demurred to the writ and, upon a pleading defect, the demurrer was

---

\* In this opinion, the usual method of judicial citation in the body of the opinion will be used for obviously legal materials and footnotes will be used for historical citations.

sustained. The city then petitioned for rehearing upon the demurrer and, such rehearing being granted, raised an issue of constitutional interpretation. The demurrer again was sustained upon technical grounds of pleading. A second alternative writ was issued, to which the assessor answered, bringing the cause to issue on the law and facts. Trial was had upon stipulation and oral testimony.

## ISSUES

■ In his demurrer the assessor questioned the jurisdiction of this court to issue a writ of mandamus. While both parties, and the State Tax Commission appearing informally, concurred that this court probably had such jurisdiction, nonetheless, the jurisdictional issue was placed squarely before the court by the demurrer, the parties by their concurrence could not confer jurisdiction of the subject matter upon the court, and in all events the court's jurisdiction is before a court in every cause, whether or not the issue is raised by the litigants. *McCain v. State Tax Com.,* 227 Or 486, 495, 360 P2d 778, 363 P2d 775 (1961).

Admittedly, there is no direct, express, statutory authority for the issuance of the writ. While a property tax matter, no proceeding in this fact situation is expressly authorized in the Oregon Tax Court Act. Therefore, the plaintiff has turned to common law principles and seeks its remedy in mandamus. Since all prior proceedings in the regular division of this court have been unquestionably within the expressed statutory procedures of the Oregon Tax Court Act, this case presents such a far-reaching and fundamental jurisdictional question of first impression, affecting matters as distant from this case as equitable recoupment and set-off [See *Commissioner of Int. Rev. v.*

*Gooch Mill. & E. Co.,* 320 US 418, 421, 64 S Ct 184, 88 L ed 139 (1943)], that a full inquiry into the jurisdiction of this court appears warranted by the issues which this case presents.

The primary issues of this case are three in number and follow one from the other. They are:

(1) Assuming for the moment the general power in this court to issue the writ of mandamus, does the remedy lie in this type of case?

(2) If mandamus is the proper remedy, does this court have the jurisdiction to issue the writ?

(3) Did the assessor properly refuse to extend the street lighting levy as violating the terms of ORS 310.400? The plaintiff contends that, with respect to home-rule cities such as itself, ORS 310.400 upon which the defendant relies in his refusal to extend the levy is inapplicable because it conflicts with Article XI, section 2, the "Home Rule" amendment, of the Oregon Constitution. This contention raises a substantial issue of constitutional interpretation.

Because this court cannot rule upon the third major issue unless it reaches an affirmative conclusion on the two procedural and jurisdictional issues, and because the first issue, if answered in the negative, would dispose of the case, this decision will be divided into these three major issues and will discuss them in the order stated.

## MANDAMUS

### *When Mandamus Lies*

■ The general rule is that mandamus is an extraordinary remedy which lies only when the plaintiff has a clear, legal right to have the defendant per-

form the duty to be commanded by the writ and when the plaintiff has no plain, speedy, and adequate remedy at law to obtain his right and enforce the performance of the defendant's duty. Mr. Justice LORD described the remedy and its origin in *Habersham v. Sears,* 11 Or 431 (1884), as follows (pp 434-35):

"* * * Under the code, the office of the writ is precisely the same as it was under the common law. (*Warner v. Myers,* 4 Or., 75; *Durham v. Monumental S. M. Co.,* 9 Or., 43.) It may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office trust or station. * * * The writ shall not be issued in any case where there is a plain, speedy and adequate remedy at law. (Civil Code, sec. 583.) The object of the writ is to prevent a failure of justice, and is based upon reasons of justice and public policy. 'The reason why we grant these writs,' said Lord Hardwick, when presiding in the King's Bench, 'is to prevent a failure of justice, and for the execution of the common law, or of some statute, or of the King's Charter.' (*The King v. Wheeler,* Cas. temp. Hardw. 99; S.C. Cunningham, 155.) To the same effect, but more fully, Lord Mansfield expressed himself as follows: 'A mandamus is a prerogative writ, to the aid of which the subject is entitled, upon a proper case previously shown, to the satisfaction of the court. The original nature of the writ, and the end for which it was framed, direct upon what occasions it should be used. It was introduced to prevent disorder from a failure of justice, and defect of police. Therefore, it ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be one. Within the last century, it has been liberally interposed for the benefit of the subject and advancement of justice. The value of the matter, or the degree of its importance

to the public police, is not scrupulously weighed. *If there be a right, and no other specific remedy, this should not be denied.* (*Rex v. Barker,* 3 Brun., 1265, 1267.) In brief, the writ is a summary remedy, for the want of a specific one, where there would otherwise be a failure of justice. (*State, Relation of McClellan v. Graves et al.,* 19 Md., 374.) Its object is not to supersede, but to supply the want of a legal remedy. To authorize its issuance, two facts must coexist, the right to have the particular act or duty performed and the want of an adequate or specific remedy at law. In determining them, the question presented by this record, it is not sufficient to warrant the relief prayed for that the plaintiff has a clear legal right to have the duty performed, but it must also appear that the law affords him no other specific, legal remedy, fully adequate to redress his grievances. * * *"

The nature of an adequate remedy in this context was succinctly stated by Mr. Justice LATOURETTE in *State ex rel Ricco v. Biggs,* 198 Or 413, 425, 255 P2d 1055 (1953):

"4, 5. Mandamus is an extraordinary remedy and is not a writ of right; it will never issue unless the duty sought to be enforced is one legally defined. Neither will it issue where there is a plain, speedy, and adequate remedy in the ordinary course of law. However, to bar mandamus, the law remedy must afford all relief to which the plaintiff is entitled. *State ex rel. Hupp etc. Corp.,* supra. The primary function of a writ of mandamus is to enforce an established right and to enforce a corresponding imperative duty created or imposed by law. It is designed to promote justice. It may issue even where other remedies exist, if they are not sufficiently speedy to prevent material injury. Propriety of the issuance of the writ is determined by the inadequacy, and not the mere absence, of other legal remedies and the danger of a failure of jus-

tice without it. *State ex rel. Pierce v. Slusher,* 117 Or 498, 501, 244 P 540."

Thus, both the lack of a clear duty and the lack of an available and fully adequate, legal remedy must appear before the writ will lie.

## Jurisdiction Depends on Writ

■ Ordinarily, a court's jurisdiction "depends primarily upon the averments of the complaint." *McDonough v. Southern Or. Mining Co.,* 177 Or 136, 149, 159 P2d 829, 161 P2d 786 (1945). In mandamus, however, the first pleading, the petition for the writ, is *functus officio,* once the writ issues. *Makinson v. School District No. 4,* 209 Or 232, 235, 304 P2d 1076 (1956). The alternative writ in mandamus takes the place of the complaint in other actions. It "must contain facts alleging a cause of action and such facts must be legally sufficient so that the mandamus portion of the writ follows as a matter of law." *State ex rel Venn v. Reid,* 207 Or 617, 622-3, 298 P2d 990 (1956). Assuming this court's power to issue the writ, its jurisdiction in mandamus in this case depends primarily, then, on the allegation of the two essential conditions for the issuance of the writ in the amended, alternative writ.

## Allegations of the Writ

The amended, alternative writ alleges the following facts. On March 9, 1962, at an adjourned, regular meeting, the Woodburn City Council adopted an ordinance referring to the people an amendment of the city charter to authorize a levy of up to four mills for street lights for the city and calling a special election to enact such amendment. On May 18, 1962, such

election was duly held, at which the charter amendment was adopted. Thereafter, the budget committee prepared and presented a city budget, including the street light expense, and on July 12, 1962, the city council duly passed an ordinance levying the budgeted amount, including the street lighting assessment in the amount of $70,984. This levy was forwarded to the defendant assessor on July 13, 1962. Thereafter, presumably acting under ORS 310.070, the defendant asked the advice of the State Tax Commission concerning the validity of the levy and was told by letter not to extend it. The defendant refused to act upon the letter without a formal order. On September 13, 1962, the State Tax Commission issued its Opinion and Order No. VL 62-156, in which it directed the defendant not to extend the Woodburn street lighting levy. It based its order upon the failure of the ballot measure authorizing the levy to comply with ORS 310.400, which requires the measure in a tax election to set forth the amount of the levy in dollars and cents. The plaintiff acknowledges in the writ that the levy was set forth in mills and not in dollars and cents but avers that, under the city "Home Rule" amendment of the Oregon Constitution, ORS 310.400 is inapplicable in this case. The defendant complied with the order of the State Tax Commission, did not extend the levy, and informed the plaintiff of his refusal to act. On September 19, 1962, the plaintiff sued out its writ here in question.

The parties generally agree upon the material facts of this case as set forth in the amended writ. While the defendant denied most of the amended writ upon information and belief to put the plaintiff on its proof, he offered no contrary evidence, the allegations of the writ, other than legal conclusions, were proved, and

no objection to the levy has been made, and no basis for the action of the defendant as directed by the commission has been alleged, other than the failure of the ballot measure to conform to ORS 310.400.

## No Adequate Legal Remedy

■ In the writ the plaintiff alleges that it had no plain, speedy, and adequate remedy at law. The defendant denies this allegation and contends that mandamus does not lie. The remedy which the defendant claims was available was that provided by ORS 306.545. This section is the general property tax appeal section of the Oregon Tax Court Act, Oregon Laws 1961, ch 533, and in its material parts reads:

> "306.545. Any taxpayer, county assessor, county board of equalization or county sheriff aggrieved by and directly affected by an order of the State Tax Commission may appeal to the Oregon Tax Court, * * *."

The defendant's position is that, under this section, either the city could have appealed to this court from the commission order or, if not, a taxpayer of the city could have appealed on its behalf. The plaintiff contends that this statute makes no provision for appeal by the tax levying body and that a city, with the right to sue and be sued, is not required to seek its remedy by the subterfuge of a taxpayer representing its interests.

Clearly this statute does not provide for a suit by the city. Only four types of plaintiffs are contemplated by the statute and they are expressly named. Therefore, the city could not have proceeded under ORS 306.545. The city also is correct in its contention that it is not required to seek its remedy by an agent and such taxpayer's suit is not an adequate remedy at

law. 30 CJS 349, Equity § 25. Furthermore, no appeal by the city lies under ORS 306.547, which allows proceedings by "taxpayers" affected by supervisory orders of the commission issued under ORS 305.090 and 306.111, because, again, the city is not a "taxpayer." Thus, neither ORS 306.545 nor ORS 306.547 constitute an adequate remedy at law for the city.

The defendant next contends that, if the city has no remedy, no remedy was intended for it but rather such remedy is specifically denied to the city under ORS 306.580, which reads:

> "306.580 The remedies provided for in ORS 305.105, 305.515 to 305.555 and 306.515 to 306.560 shall be exclusive and no taxpayer, county officer or board shall maintain any suit, action or special proceeding in any court of this state with respect to the assessment and taxation of property or the collection of any tax thereon on any grounds, including fraud, where it shall appear that such remedies were available."

A full discussion of this section is not necessary here. Suffice it to note that the same parties who were granted a remedy by ORS 306.545 are denied any other remedy by ORS 306.580, and since the levying body, here the plaintiff city, is not included in the remedy of ORS 306.545, the prohibition of ORS 306.580 likewise is inapplicable.

## Clear Legal Right

■ Mr. Justice Lord's other requirement was that there be a clear, legal right to have the duty performed. It has been said so frequently as to require little supporting authority that mandamus will lie to enforce a ministerial duty but not one which involves the exercise of discretion. *Johnson v. Craddock*, 228

Or 308, 314, 365 P2d 89 (1961). Mandamus has been used extensively to force the levy of a tax. *State ex rel v. Melville,* 149 Or 532, 547, 39 P2d 1119, 41 P2d 1071 (1935), and cases there cited. It also has been invoked to require the assessor to perform his ministerial duty. *State ex rel v. Smith,* 197 Or 96, 252 P2d 550 (1953). While these cases are not on all fours with the instant case, they are quite close enough to establish clearly that the extension of a tax levy is a ministerial act and that mandamus will lie to require an assessor to extend a tax levy.

The defendant does not deny that it is his duty to extend a levy as a ministerial act, but he claims that the State Tax Commission order relieved him of this duty, thereby destroying any right to mandamus. In support of his position, he cites ORS 306.220, requiring compliance by every officer "with any lawful order" of the commission and contends that he is refusing to perform a ministerial duty because he is ordered to do so by competent authority.

In addition, though he did not, he might have sought to rely upon ORS 310.070 which reads:

"310.070 If the levy reported to the clerk and assessor under ORS 310.050 is in excess of the constitutional or statutory limitations, or both, the assessor shall not enter the excessive levy upon the tax roll of the county and the assessor, upon the advice of the State Tax Commission, shall extend upon the tax roll of the county only such part of the levy as will comply with the constitutional and statutory limitations governing the levy."

However, there is no allegation that the levy is excessive or that the assessor acted under this section. In fact, the record establishes that he refused to act on the advice of the commission and required its

formal order. While ORS 310.070 might have been invoked, it was not and the facts necessary for its invocation do not appear.

The question, then, boils down to this: Does the mere issuance of the commission order defeat the pre-existing, clear right to the writ—does its issuance destroy the clear legal duty of the assessor without any right of review of the validity of that order? The logical answer is negative. To hold otherwise is to say that this apparent right has no remedy, a position which Mr. Justice Johnson referred to so cryptically as "rather paradoxical." *Fairfax's Devisee v. Hunter's Lessee,* 7 Cranch (11 US) 603, 629. The city cannot appeal from the order under ORS 306.545 or 306.547. It cannot sue out mandamus, an injunction, or other special proceedings against the commission because the commission acted judicially in deciding the same issue sought to be presented to this court. It cannot go into circuit court on a writ of review, because the writ only tests the formalities and jurisdiction of the commission and the issue here goes to the correctness of the commission decision. *Bechtold v. Wilson,* 182 Or 360, 186 P2d 525, 187 P2d 675 (1947). The only adequate remedy left to the city by which it can try out the validity of the commission order is mandamus against the assessor.

The compulsion of ORS 306.220 is not designed to obstruct such judicial review. The statute is expressly cumulative. The instant order is subject to review under ORS 306.545 in this court by the taxpayer or a county official. The assessor could have appealed it. To say that the other side, the city, is not also entitled to its day in court because of ORS 306.220 is, at least, "rather paradoxical." The obvious purpose of ORS 306.220 is to prohibit officials from ignoring the com-

mission's orders, and not to prohibit proper, judicial scrutiny of them. It cannot be invoked here to deny to the city a right to judicial review which the assessor or any taxpayer has under ORS 306.545.

Here we have a right searching for a remedy. With the sole right to review property tax orders of the commission vested in this court and with the terms of ORS 306.545 excluding the levying city from its operation, it logically follows that this court is vested with the power to find that remedy, if one is to exist at all. Assuming for the moment the general jurisdiction of this court, the instant case appears to call into operation the language of ORS 1.160, which reads:

> "1.160 When jurisdiction is, by the constitution or by statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding is not specifically pointed out by the procedural statutes, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of the procedural statutes."

As pointed out in *Aiken v. Aiken,* 12 Or 203, 208 (1885), there falls to the court in this situation the task of devising or adopting "any suitable process or mode of proceeding \* \* \* which may appear most conformable to the spirit of the code."

Since the extension of a levy on the rolls is a ministerial duty of the assessor, a suitable process or mode of proceeding is mandamus, the remedy which the plaintiff has chosen. The writ is not sought in an attempt to supersede an existing remedy. Since ORS 306.545 is the legal remedy for review of a State Tax Commission order, but its procedure is not available to a levying body, no adequate, specific, legal remedy

exists. The goal in this proceeding is to apply an appropriate remedy to protect this right, to prevent a failure of justice. Since an order of the commission to the assessor not to extend a levy does not destroy the right of the city to mandamus, mandamus appears to be the proper method of testing the commission order and lies in this case.

## JURISDICTION

### *Jurisdictional Statutes: Construction Necessary*

■ The second major question is whether this court has the power to issue the writ. No statute directly and expressly either authorizes or prohibits the issuance of the writ of mandamus by this court in this case. The power of this court to do so, or its lack of such power, must be ascertained by construction of the statutes touching upon this subject directly and indirectly.

As usual, the goal of such construction must be to ascertain and pronounce the legislative intent. *State v. Rawson,* 210 Or 593, 312 P2d 849 (1957). In this construction the court must so construe the statutes as to serve the purposes and attain the objects which the legislature intended. *State of Oregon v. Buck,* 200 Or 87, 262 P2d 495 (1953). To assist the court in this task there are a number of statutory and judicially pronounced rules of construction which can be applied, but in their application and in deciding between such rules as conflict, the court must keep in mind the goal of the search—to ascertain and follow the legislative object, purpose, and intent.

### *Jurisdictional Statutes: The Entire Statute*

■ The first, and often most helpful, inquiry is directed at the legislative act as a whole, because

from consideration of the entire act the over-all, legislative purpose and intent becomes clearer than it does from the isolated words or phrases of the statute. *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640 (1949).

■ The Oregon Tax Court Act, Oregon Laws 1961, ch 533, created a court of justice (ORS 305.405) which takes the place of the circuit court, the general trial court, in the field of state income, property, and forest taxation. ORS 306.545, 305.547, 308.620, 314.460, 321.115, 528.190. It gives the judge of the court status equal to that of a circuit judge (ORS 305.452 to 305.500) and generally provides the court with the tools of a plenary, trial court. It requires that all cases be reported (ORS 305.430) and that the opinions of this court be published. ORS 305.450. The jurisdiction of the court is made exclusive in its field of operation and the concurrent exercise of such jurisdiction by the circuit courts is expressly prohibited. ORS 305.410, 306.580. Only the Supreme Court has the authority to review this new court's decisions. ORS 305.445.

The act also makes important changes by substantially enlarging the scope and function of judicial proceedings in tax controversies. This subject is fully discussed in *Strawn v. Commission,* 1 OTR 98 (1962) (at pages 142 to 148) and to a lesser extent in *Sproul v. Commission,* 1 OTR 31 (1962), and those cases as they treat this subject are adopted as part of this decision. Summing up at page 145 of the *Strawn* decision, this court said:

> "Clearly, from all these various features, the legislative intent in the adoption of the Oregon Tax Court Act was to confer on this court the broadest powers of determination and to give it the tools with which to exercise its jurisdiction

properly. * * * The proceeding before this court is plenary, not summary; it is an independent, *de novo* trial of the issues before the court, not merely a review of the record for error in procedure or jurisdiction; and now, as in other justiciable controversies, the litigant can obtain a full and complete remedy in taxation from an independent court exercising full judicial powers."

From the terms of the Oregon Tax Court Act considered as a single, integrated, legislative action, it appears that the legislature sought, not to reduce the taxpayer's remedy by creating an inferior court with limited powers, but rather to replace the circuit court in this technical field of taxation with a new, specialized court having broad, remedial powers; and, in so doing, it intended to grant to this new court within its general field all the circuit court powers of a general, trial court. Prior to the creation of the Oregon Tax Court, the circuit court would have had the power to issue the writ of mandamus in this case. ORS 34.120. The intent of the Oregon Tax Court Act as a whole appears to be to transfer this power, with the other powers of the circuit court as a court of general jurisdiction, to the new tax court within its field of state income, property, and forest taxation.

### *Jurisdictional Statutes: Legislative History*

■ In ascertaining legislative intent, it is the mode to consider legislative history. That history can be of substantial help here within the limit of its proper use. See Stringham, *Crystal Gazing, Legislative History in Action,* 47 ABAJ 466 (1961).

The Oregon Tax Court Act is the culmination of a legislative effort to obtain an independent, tax tri-

bunal in Oregon which began in 1949, when Senator Ben Musa introduced a bill to create a board of tax appeals, an independent, administrative tribunal.[1] At that time, general professional thinking on tax adjudication contemplated the limited review of an administrative board. The United States Tax Court was, and is, part of the executive branch of government, and while its powers are somewhat broader than those of the usual, administrative board, it is not a court in the sense of a general, trial court at the state level. It and one or two state boards of tax appeal, as well as Senator Musa's personal background in administrative proceedings as a certified public accountant, were the influencing factors in the choice in 1949 of the board of tax appeals approach.

The 1949 effort of Senator Musa met failure, as did his efforts, and later those of his wife, Representative Katherine Musa, in ensuing sessions until 1959.[2] In 1959, the legislature passed a bill creating a board

---

[1] Senate Bill 264, 45th Legislative Assembly (1949). The bill died in the Senate Committee on Taxation. *House and Senate Journal, 45th Legislative Assembly,* p 744.

[2] Senate Bill 8, 46th Legislative Assembly (1951) sought the creation of a board of tax appeals. Introduced on January 9, 1951, it was referred to the Senate Committee on Taxation and reported out by that committee on February 28, 1951, with a recommendation that it do not pass. A motion to substitute the minority report that it do pass made on that day was defeated 18 nays to 9 ayes. The majority report then was adopted. *House and Senate Journal, 46th Legislative Assembly,* p 608. House Bill 685, introduced on April 14, 1955, by Mrs. Musa as Representative from Wasco County inasmuch as Senator Musa did not serve in the 1953 and 1955 sessions, sought the creation of a state board of tax review, was referred to the Committee on Ways and Means, and died in committee upon adjournment sine die. *House and Senate Journal, 48th Legislative Assembly* (1955), p 851. House Bill 11, 49th Legislative Assembly (1957) sought the creation of a board of tax appeals. It died in committee. *House and Senate Journal, 49th Legislative Assembly,* p 929.

of tax appeals.[3] Though Governor Hatfield supported legislation of this type, he was forced to veto this bill because no funds had been provided for the board's operation.[4]

Finally, in the 1961 legislative session, this twelve year effort was brought to a successful conclusion. In that session the legislature had before it the bill which became the Oregon Tax Court Act and a bill to create a board of tax appeals.[5] In the two years intervening between the 1959 and 1961 sessions, the Oregon State Bar[6] and the accounting profession had been active

[3] House Bill 23, 50th Legislative Assembly. Introduced on January 14, 1959, the bill passed the House 56 to 0 on April 20 and passed the Senate 28 to 0 on April 23. It was signed by the Speaker on April 29 and by the Senate President on May 1. *Senate and House Journal, 50th Legislative Assembly,* pp 656-57.

[4] On May 8, 1959, two days after the close of the 50th Legislative Assembly, the Governor's veto was filed with the Secretary of State. The veto message read:

Dear Mr. Appling

I am filing herewith House Bill No. 23, unsigned and unapproved.

House Bill No. 23 creates a separate Board of Tax Appeals without altering the responsibilities or organization of the State Tax Commission.

I find the bill objectionable because it creates an agency without a legislative appropriation to cover its necessary expenditures.

For these reasons, I veto House Bill No. 23.

Sincerely yours,

Mark O. Hatfield

[5] Senate Bill 370, 51st Legislative Assembly. This bill creating a board of tax appeals was tabled in the Senate Committee on Taxation on March 22, 1961, two days after the Oregon Tax Court bill, Senate Bill 137, was reported out do pass. *Senate and House Journal, 51st Legislative Assembly,* pp 585 and 530.

[6] To the 26th Annual Meeting of the Oregon State Bar, at Gearhart, Oregon, on September 22-24, 1960, the Bar's Committee on Taxation recommended that the Bar recommend to the 51st Legislative Assembly the creation of a tax court. Committee

in considering the alternatives and preparing the legislation.[*] After consideration of the two alternatives and at the urging of the bar and the accounting profession, the legislature made the clear-cut choice of a tax court as part of the judiciary of the state.

In interpretation of this act, the legislative decision between the choices available and presented to it is entitled to full consideration. *State ex rel Appling v. Chase,* 224 Or 112, 116, 355 P2d 631 (1960). A court with less than general jurisdiction would be scarcely more than a substitute for a board of tax appeals. The clear import to be drawn from the legislative choice is that the legislature did not intend to create an inferior tribunal with severely constricted powers of review, but rather it established a true court of justice with the plenary, judicial powers of a general, trial court and reviewable only by the Supreme Court.

### *Jurisdictional Statutes: Particular Provisions*

■ Though, as already noted, the Oregon Tax Court Act is silent both as to the general power of mandamus and the general or special jurisdiction of the court, it does contain various provisions which are helpful in determining the legislative intent.

First, the act specifically authorizes this court to issue the writ of mandamus to require a taxpayer to file a tax return. ORS 314.365. This is in derogation

Reports of the Oregon State Bar, 1960, 26th Annual Meeting, p 193. It also proposed the text of an act. Id pp 197-208. Amendments to the draft of the act were proposed and adopted and the recommendation of the committee and the amended proposed act were adopted and approved. Official Proceedings of the 26th Annual Meeting of the Oregon State Bar, pp 82-88.

[*] The Oregon Tax Court Act, Senate Bill 137, was introduced at the request of the Oregon State Bar and the Oregon Society of Certified Public Accountants. *Senate and House Journal, 51st Legislative Assembly,* p 530.

of the terms of ORS 34.120, which grants exclusive, mandamus jurisdiction to the circuit courts, except for the original, mandamus jurisdiction of the Supreme Court. In effect, ORS 314.365, coupled with the exclusive jurisdiction provision of ORS 305.410, amounts to an implied amendment or partial repeal of ORS 34.120 as to the tax court. The question remains as to whether it is part of a general vesting of the writ in the tax court in tax cases.

A limitation of the amendment to the particular case can be supported by the maxim *"expressio unius est exclusio alterius." Rosentool v. Bonanza Oil and Mine Corp.,* 221 Or 520, 352 P2d 138 (1960). It also can be supported by the general rule that implied amendment and repeal are not favored. *Appleton v. Oregon Iron & Steel Co.,* 229 Or 81, 358 P2d 260, 366 P2d 174 (1961).

On the other hand, the foregoing maxim is not a rule of law but merely a guide in determining intent. *Moore v. Schermerhorn,* 210 Or 23, 31, 307 P2d 483, 308 P2d 180 (1957). "It is to be applied with caution and merely as an auxiliary rule to determine the legislative intention." *Cabell v. Cottage Grove,* 170 Or 256, 281, 130 P2d 1013 (1943). Once the legislative intent becomes clear from whatever source, the maxim becomes functus. This legislative intent also overrides the construction which disfavors implied amendment. It too is merely an aid in reconstructing what the legislature had in mind. "[I]f the enforcement of an earlier statute would thwart the purpose of a later one, resort will be had to the doctrine of repeal by implication. * * * The same reasoning applies to amendments by implication. [Citation omitted]" *State ex rel Med. Pear Co. v. Fowler,* 207 Or 182, 195, 295 P2d 167 (1956). The legislative in-

tent as shown by the foregoing discussion of the general statute and its legislative history supports the broader, implied amendment vesting the general mandamus power in this court in its tax cases. This conclusion is buttressed by the legislative history of the particular section, ORS 314.365.

This mandamus section appears to be the only express grant of the writ in tax cases and provides for its issuance where mandamus ordinarily would not lie. Prior to 1961, the power to issue the writ in this situation, as well as the review of tax cases, was vested expressly in the circuit court. This did not conflict with the grant of exclusive, mandamus jurisdiction to the circuit court. ORS 34.120.

With the adoption of the Oregon Tax Court Act, it was the legislative intent to transfer all the circuit court functions in income, property, and forest taxation to the tax court. ORS 305.410. As part of this intent, ORS 314.365 was amended. In other words, the amendment of ORS 314.365 was not an isolated change, but rather it was part of an over-all transfer of jurisdiction. If the circuit court had had no power of mandamus in tax cases other than expressed by this statute, then likewise, the power of this court would be similarly limited. Since the circuit court did have the mandamus power in tax cases other than cases involving a failure to file a return [see *Kollock v. Barnard,* 116 Or 694, 242 P 847 (1926)], the legislative intent from the four corners of the act appears to have been to transfer this power to this court exclusively. ORS 305.410.

To read the Oregon Tax Court Act so stringently as to permit mandamus in this court only in the case expressly described in ORS 314.365 would bring about one of two results, both of which appear to be con-

trary to the general legislative intention. The first result would be that the remedy of mandamus would be left in the circuit court in contradiction of the language of ORS 305.410, which is discussed at length immediately hereafter. This would mean that all tax remedies lie in this special court, except only the remedy of mandamus. Such result clearly is not intended by the act and does not credit the legislature with that coherence of thought with which the court usually shrouds it. The second possible result would be to imply the repeal of mandamus entirely as a remedy in taxation, except in that case covered by ORS 314.365. The logic of this result is equally tenuous. In effect, rather than imply an amendment of ORS 34.120 to transfer mandamus jurisdiction in tax cases to the tax court as the act appears to intend, it would imply amendment of ORS 34.120 to destroy altogether the mandamus remedy in taxation because ORS 314.365 does not mention more than one case of mandamus, ORS 305.410 vests exclusive jurisdiction in tax cases in the tax court, and yet ORS 34.120 does not permit mandamus elsewhere than in the circuit court.

▓ Yet this problem in construction of apparently conflicting statutes cannot be ignored. Since, after 1961, ORS 34.120 cannot be read independently of ORS 305.410 and ORS 314.365, these three sections must be read in the most logical of the possible three ways. They should not be so read that the circuit court be deemed to retain mandamus jurisdiction in tax cases, except as provided in ORS 314.365, because this reading ignores the later ORS 305.410 making the tax court's jurisdiction exclusive in income, property, and forest tax cases. They should not be so read that the remedy of mandamus be deemed repealed in tax cases except as provided in ORS 314.356, because

this result relies upon an implied repeal no less disfavored than the one here proposed and is wholly unsupported by, and rather is contrary to, the apparent legislative intent. The third and most logical reading implies the transfer of mandamus jurisdiction in tax cases to the tax court, and this last reading is the best construction because it favors the later statute over the earlier one and particularly because it is consonant with the very apparent legislative intent.

Perhaps primary among the sections of the Oregon Tax Court Act lending support to the general theory of a transfer to this court of all circuit court powers in its tax fields is ORS 305.410, heretofore frequently cited, which reads:

> "305.410 (1) Subject only to the provisions of ORS 305.445 relating to judicial review by the Supreme Court, the tax court shall be the sole, exclusive and final authority for the hearing and determination of all questions of law and fact arising under the tax laws of the state in cases within its jurisdiction.
>
> "(2) No person shall contest, in any action, suit or proceeding in the circuit court or any other court, any matter reviewable by the tax court."

Of similar import, but limited to property tax cases, is ORS 306.580, partially quoted above, which reads in its entirety:

> "306.580 The remedies provided for in ORS 305.105, 305.515 to 305.555 and 306.515 to 306.560 shall be exclusive and no taxpayer, county officer or board shall maintain any suit, action or special proceeding in any court of this state with respect to the assessment and taxation of property or the collection of any tax thereon on any grounds, including fraud, where it shall appear that such remedies were available."

These two statutes overlap. The latter was an existing statute and was amended in 1961. The former, far more inclusive, is an original enactment in 1961. The exact limitations of ORS 305.410 are hard to define but its intent appears to be a part of the over-all intent of the act to make the tax court the exclusive, trial court in state income, property, and forest tax cases and thereby to place it in the position of a specialized, circuit court in this field.

To read ORS 305.410 otherwise than as a general grant of circuit court powers and an expression of the legislature to make such grant renders that section a useless act. The Oregon Tax Court Act repealed all statutory, circuit court appeals and vested in this court the judicial review in these cases. Oregon Laws 1961, ch 533, §§ 41, 42, 44, 47, 48, 51, 52, and 55. Even without ORS 305.410, only this court has jurisdiction of the statutory review proceedings and no jurisdiction over the statutory procedures remains in the circuit courts.

Yet the legislature did enact ORS 305.410. "It must be presumed that the legislative body had a purpose in mind in all the language it used, * * *. * * * and one of the accepted rules of statutory construction requires courts so to construe a statute as to give effect to every section, clause, phrase or word of the legislative act." *Blyth & Co., Inc. v. City of Portland,* 204 Or 153, 159, 282 P2d 363 (1955). Since exclusive jurisdiction over the statutory proceedings was already vested in this court, the only logical purport of ORS 305.410 is to grant to this court the other circuit court powers and proceedings in those tax fields over which it is given jurisdiction. In other words, ORS 305.410 is both a catch-all to cover all the various types of proceedings not other-

wise specifically covered in the act and an expression of legislative purpose to vest jurisdiction in all income, property, and forest tax cases exclusively in this court.

Finally, the theory of a general grant of circuit court powers is supported by section 54 of the act, now subsection (4) of ORS 305.610, which provides that the Oregon Tax Court shall not have jurisdiction over cases to enforce foreign tax liability. If ORS 305.410 is not intended to extend the court's jurisdiction beyond the statutory proceedings expressly mentioned in the act, this negation of jurisdiction would be meaningless. The language of section 54 can be rendered useful only by interpreting broadly the meaning of ORS 305.410, as has been done here.

Thus, from the Oregon Tax Court Act as a whole, there appears a clear legislative purpose and objective to transfer to the tax court all the powers of the circuit court in income, property, and forest tax cases. This intent to create a court of general jurisdiction in taxation appears not only from the act as a whole but also from its legislative history, including the clear-cut choice of a plenary judicial court over a limited, administrative tribunal, but also from the language of ORS 305.410, buttressed as it is by the effect of ORS 305.610.

As a court of general jurisdiction, the circuit court has always applied the remedy of mandamus in appropriate tax cases. Under ORS 314.365 prior to 1962, it had additional statutory mandamus power in a situation in which mandamus ordinarily would not lie. ORS 314.365 was amended to grant this additional mandamus power to the tax court. The logical interpretation of this amendment does not limit the tax court to this statutory mandamus but construes the

amendment as a part of the over-all transfer of tax jurisdiction to the tax court. Any other interpretation constricts the tax remedy by destroying a well-recognized right to mandamus or leaves the nonstatutory mandamus remedy hanging in circuit court vestigially like an appendix, without much reason and just there to cause trouble.

The conclusion to which the controlling legislative intent, purpose, and objectives and the statutory language leads us and which leads directly to the next, very difficult problem is that the Oregon Tax Court Act created a court in which is vested not only those remedies specifically set forth in the act but also all those remedies in income, property, and forest taxation which have been recognized as being vested in the circuit courts prior to 1962 and which are vested in this field in courts of general jurisdiction as nonstatutory remedies, legal, equitable, and special, to which taxpayers have been permitted to resort when the statutory remedies are not plain, speedy and adequate. Among these remedies is the writ of mandamus.

### Question of General v. Inferior Jurisdiction

■ This broader interpretation of the jurisdiction of this court in accordance with the clearly apparent legislative intent from the act brings us inexorably to the most complex issue inherent in the entire jurisdictional question. This issue is whether this court is a court of general or inferior jurisdiction, and coupled with it is a corollary of whether the remedies in this court are general remedies or are special and statutory. In a consideration of these two questions dilemma following upon dilemma arise from the interaction of the legislative intent with the exist-

ing concepts of court jurisdiction and the nature of the judicial remedy in taxation.

To say that the legislative intent of the Oregon Tax Court Act is that the tax court have, not only the remedies described in the statute, but also those which the circuit courts heretofore have exercised in taxation is to find that, by definition, the tax court within the field of state income, property, and forest taxation is a court of general jurisdiction, as opposed to a court of special, limited, and inferior jurisdiction. Such finding leads inevitably, as will be seen, to the conclusion that the remedy provided by statute for judicial review of tax cases is not a special and statutory remedy but is intended by the legislature to be a general remedy. Yet to so find this court one of general jurisdiction, administering a general, rather than a special, statutory, remedy, conflicts head on with prior judicial thinking concerning the courts and their remedies in this field. An ultimate conclusion based upon the legislative intent and running contrary to decisions with respect to prior tax review statutes and procedures is only warranted after a complete consideration of the alternatives and the various, fundamental concepts involved.

### General and Limited Jurisdiction Distinguished

The basic distinction between a court of general jurisdiction and one of limited jurisdiction lies in whether the court's powers are inherent and are limited only by statute, in the case of a court of general jurisdiction, or whether the court has no power that is not conferred by statute, in the case of a court of limited jurisdiction. *Garner v. Garner,* 182 Or 549, 189 P2d 397 (1948). This basic distinction has been

defined in Oregon in *Heatherly v. Hadley,* 4 Or 1, 13 (1869), as follows:

> "* * * 'Nothing shall be intended to be out of the jurisdiction of a Superior Court, except that which especially appears to be so; on the contrary, nothing shall be intended to be within the jurisdiction of an inferior Court, unless it be so expressly alleged.'"

This distinction in their jurisdiction creates a further distinction in the import attaching to the judgments or decrees of courts of general and inferior jurisdiction. As stated in *Tustin v. Gaunt,* 4 Or 305, 309 (1873), quoting from *The Lessee of Grignon v. Astor,* 43 US (2 How) 319, 341, 11 L ed 283, 292 (1844), this distinction is:

> "'A Court which is competent, by its constitution, to decide on its own jurisdiction, and to exercise it to a final judgment, without setting forth in their proceedings the facts and evidence on which it is rendered, whose record is absolute verity, not to be impugned by averment, or proof to the contrary, is of the first description; there can be no judicial inspection behind the judgment save by appellate power. A Court which is so constituted that its judgment can be looked through for the facts and evidence which are necessary to sustain it, whose decision is not evidence of itself to show jurisdiction and its lawful exercise, is of the latter description; every requisite for either must appear on the face of their proceedings, or they are nullities.'"

█ In effect, then, a court of general jurisdiction has the power to dispose of all matters within its general ken, unless a statute takes the particular power away, and its jurisdiction of a particular case is presumed. On the other hand, a court of special, limited, and inferior jurisdiction only has that jurisdiction

expressly conferred by a statute and in each case its statutory jurisdiction must be established by the pleadings. In connection with these definitions, it must be noted that a limitation as to general subject matter does not render a court limited or inferior, viz: probate courts. *Fox v. Lasley,* 212 Or 80, 318 P2d 933 (1957). It is only when within that subject matter it is limited to special, statutory powers that a court becomes special, limited, and inferior. For a discussion of a similar problem re probate courts, see Jaureguy and Love, *Oregon Probate Law and Practice,* § 501-18, esp. § 506.

This jurisdictional distinction is basic to this case, because here there is no express, statutory authority for this court's issuance of mandamus. If this court is to have the power to hear and decide all income, property, and forest tax cases, as it appears that the legislature intended it should, this court must be a court of general jurisdiction, one not restricted to only those powers expressly conferred by statute, and, unless it is a court of general jurisdiction, this writ of mandamus will not lie from this court. If, on the other hand, despite the legislative intent to the contrary, this court is a special, limited and inferior court and has no power not expressly conferred by statute, then, the writ does not lie from this court.

### Creation of Jurisdiction, General or Inferior

Clearly, the legislature has the power to create courts of either general or special, limited, and inferior jurisdiction. Oregon Constitution, Amended Art VII, § 1. Yet a problem arises when an attempt is made to determine what makes a court one of general jurisdiction. Instead of finding that this determination turns upon what the legislative act says about general

or special jurisdiction, we find that the determining factor is the nature of the remedies which the legislative act makes available in the court. Any court, even though it otherwise be a court of general jurisdiction, is a court of special, limited, and inferior jurisdiction when it exercises a special, statutory remedy conferred on it and created by statute and not according to the common law. *Wadhams & Co. v. State Tax Comm.*, 202 Or 132, 137, 273 P2d 440 (1954) ; *Garner v. Garner, supra* at 555.

■ To determine the jurisdiction of a court by the nature of the remedy which it is empowered to invoke raises the question of whether, in fact, the legislature can create a court of general jurisdiction as such. The legislature cannot create a remedy known to the common law. It can only codify, amend, or repeal the common law remedies. Any remedy which the legislature creates must, by definition, be a special, statutory remedy. Since it cannot create a common law remedy, it cannot create a court of general jurisdiction. It can only create courts to which it assigns remedies. Thus, it probably is more accurate to say that the legislature, by assigning various remedies to a court, has the power to determine, by the general or special, statutory nature of those remedies, whether the court is one of general or special, limited, and inferior jurisdiction. It is because the nature of the remedy assigned to this court determines the nature of its jurisdiction and because the nature of that remedy as heretofore determined by the courts with respect to the circuit courts conflicts with the intent of the legislature to make this court a court having general jurisdiction that in this case we are faced with the dilemmas as to jurisdiction and remedy.

## *Nature of the Remedy: The Alternatives*

 Heretofore the judicial review of tax cases has been held to be a "special, statutory proceeding" in a court of general jurisdiction. This means that the jurisdiction of the court "is limited by the terms of the statute conferring the power." *Wadhams & Co. v. State Tax Comm., supra* at 137. Though the circuit court has inherently all the powers of a court of general jurisdiction, yet when it sat in tax cases, it had only the powers conferred expressly by the statute and became, in essence, a court of special, limited, and inferior jurisdiction. In support of this position and in explanation of its meaning, the court in *Wadhams & Co. v. State Tax Comm., supra,* cited *Garner v. Garner, supra* at 555, and cases cited therein. In the cited part of *Garner v. Garner,* the court said:

> "1, 2. A circuit court, although a court of general jurisdiction, is, when 'exercising a special power conferred upon it by statute, and not according to the course of the common law,' a court of special and inferior jurisdiction, such jurisdiction being limited by the terms of the statute conferring the power."

Such was the rule expressly declared in property tax cases by *In re Gebauer Apartments,* 170 Or 47, 131 P2d 962 (1942) and subsequent cases. This same position has been taken recently in income tax cases prior to 1962, with less justification and with substantial dissent. *McCain v. State Tax Com.,* 227 Or 486, 360 P2d 778, 363 P2d 775 (1961).

This definition of the remedy in taxation as special and statutory under the prior procedure in circuit court did not preclude other than statutory remedies being exercised in taxation, including the special pro-

ceeding at issue in this case, because, in addition to being a court of special, limited, and inferior jurisdiction when exercising the tax review procedures provided by statute, the circuit court also was constitutionally a court of general jurisdiction. Consequently, despite statutes making certain tax review proceedings exclusive, it nonetheless has always been recognized that the circuit courts have had powers beyond the so-called "special, statutory remedy," powers which they have exercised in the tax field as courts of general jurisdiction. Among these powers have been those of equity and the power to invoke the special remedies. Injunctions: *Dant & Russell, Inc. v. Pierce,* 122 Or 337, 255 P 603 (1927); *Standard Lbr. Co. v. Pierce,* 112 Or 314, 228 P 812 (1924); *Enterprise Ir. Dist. v. Enterprise Co.,* 137 Or 468, 300 P 507 (1931); *City of Eugene v. Keeney,* 134 Or 393, 293 P 924 (1930); *Clatsop County v. Taylor,* 167 Or 563, 119 P2d 285 (1941); Declaratory Judgment: *Redfield v. Fisher,* 135 Or 180, 292 P 813, 295 P 461 (1931); Mandamus: *Central Pacific Ry. Co. v. Gage,* 96 Or 192, 189 P 643 (1920); *State ex rel Galloway v. Watson,* 167 Or 403, 118 P2d 107 (1941); *State ex rel v. Melville, supra.* In effect, the circuit court has combined its general remedies as a court of general jurisdiction and the so-called, special, statutory remedies as an inferior court to create the entire judicial remedy in taxation.

The legislative intent in the Oregon Tax Court Act to transfer to this new court the prior circuit court jurisdiction in taxation is not as simple a problem in statutory construction as first appears, because there must be considered in the construction the basis in the Oregon Tax Court for that jurisdiction sought to be transferred, since its character as a court of gen-

eral or inferior jurisdiction is dependent upon the nature of its remedies.

This court already has held that proceedings in its small claims division are special and statutory and that in that division it is a court of special, limited, and inferior jurisdiction. Not being a court of record, its jurisdiction being limited as to amount, its decisions not being precedent, and various other features clearly make the small claims division an inferior court. See *Draper v. Mullennex*, 225 Or 267, 357 P2d 519 (1960); *Salitan v. Dashney*, 219 Or 553, 347 P2d 974 (1959); *Mitchell v. Or., Wn., Credit & Coll. Bur.*, 188 Or 389, 215 P2d 917 (1950).

If the effect of the Oregon Tax Court Act is merely to transfer to the regular division of this court the special, statutory remedy which previously was exercised by the circuit court, the end result can hardly be that intended by the legislature. Though the finding of the statutory tax review proceeding in the circuit court to be special and statutory and not according to the common law reduced the circuit court to an inferior court as to those remedies (*Wadhams & Co. v. State Tax Comm., supra; In re Gebauer Apartments, supra; McCain v. State Tax Com., supra*) it retained its general jurisdiction in all other regards, even in taxation. *Kollock v. Barnard, supra; Clatsop County v. Taylor, supra.* On the other hand, a similar finding that the remedies set forth in the statute to be exercised by the regular division of the Oregon Tax Court are special and statutory proceedings, results in both divisions of the court, the regular division and the small claims division, having only special and statutory proceedings and, therefore, only special, limited, and inferior jurisdiction. If this is the result, this court by express statutory grant would have no

general jurisdiction, no proceeding which is not special and statutory, no jurisdiction which is not special, limited, and inferior. Logically, a court without general jurisdiction, by definition, cannot be a court of general jurisdiction.

In this event a finding that the Oregon Tax Court remedy is special and statutory, as was its predecessor, would result in either of two conclusions as to the present status of the total tax remedies existing in the circuit court prior to January 1, 1962. The first, alternative conclusion is that the statutory remedies are vested in the tax court, while the remedies arising out of the general jurisdiction of the circuit court have remained vested in the circuit court. For them to remain in the circuit court defeats the apparent, clear, legislative intent to make the tax court the exclusive court in its field and to relieve the less specialized and already heavily burdened circuit courts of involvement in this technical field. ORS 305.410. The second, alternative conclusion is that these general remedies of equity and special proceedings have been abolished by the Oregon Tax Court Act. To abolish such remedies seriously contracts judicial relief in taxation, contrary to the consistent trend of legislative action to expand and perfect the rights of the taxpayer to independent, judicial protection from illegal taxation. *Strawn v. Commission, supra.* Both of these negative results run contrary to the purpose and intent of the legislature.

 To achieve the intent, purpose, and objectives of the Oregon Legislature in the enactment of the Oregon Tax Court Act, two other courses are available. Either the transfer of the general jurisdiction of the circuit court in equity and special proceedings in taxation to the Oregon Tax Court can be implied from

the clear, legislative intent manifest in the act or the remedy provided by the Oregon Tax Court Act can be interpreted to be a remedy known to the common law, thereby making this new court to which the remedy is assigned a court of general jurisdiction in taxation. To adopt the first alternative would be strained construction and anomolous, indeed. It requires the interpretation that a court, having only special, statutory remedies as its express jurisdiction, be deemed to have potentially far greater powers by mere implication. This construction is contrary to the general practice. For instance, the courts have refused to imply to the circuit court sitting in divorce any general powers of a court of equity. *Zipper v. Zipper,* 192 Or 568, 574, 235 P2d 866 (1951). To vest that court with equity powers required the express assignment of those powers by statute. ORS 107.410. Similarly, if the special, statutory nature of the tax remedy is carried over from the prior statutes to the Oregon Tax Court Act, general jurisdiction will not, and should not, be implied, despite the obvious, legislative intent to confer it.

Instead of straining any such implication of general jurisdiction into the act in support of the legislative intent to create this court as a court of general jurisdiction to which are assigned all the remedies of judicial review in taxation, it would be far more profitable and more consonant with the ordinary concepts of statutory construction to reconsider the nature of the remedies of judicial review in taxation in the light of the far broader scope of those remedies under the Oregon Tax Court Act, as discussed in *Strawn v. Commission, supra,* to ascertain whether the new remedy is, in fact, the same, special, statutory remedy exercised by the circuit courts heretofore or is rather in

its broader form under the present act a general remedy known to the common law. Such reconsideration has already been suggested under the prior act in the dissent in *McCain v. State Tax Com., supra*. It is warranted not only because the legislative intent, purpose, and objectives of the act appear in conflict with prior concepts of the judicial function and remedy in taxation but also because the Oregon Tax Court Act has made such substantial changes in the methods, purpose, and function of judicial review in tax cases. To some extent this inquiry is a continuation of that begun in *Strawn v. Commission, supra*.

### General and Special Statutory Remedies Distinguished

■ The starting point of such reconsideration is a determination of the nature and the basis for the distinction between general remedies and special, statutory remedies. The purpose of this inquiry is to determine whether the remedy in this court is general or special and statutory by the application of the distinguishing feature.

The cases distinguish between the general and special remedies upon the single ground of their common law origin or lack of it. For instance, in *Garner v. Garner, supra* (182 Or at 555), the remedy of divorce was held to be a special, statutory remedy, because:

"* * * At common law, the secular courts had no jurisdiction to take cognizance of suits for divorce *a vinculo matrimonii*. Jurisdiction of such causes, in the United States, is strictly of statutory origin. [Citations omitted]"

In adoptions, Mr. Justice HAY, in *Williams v. Capparelli*, 180 Or 41, 44, 175 P2d 153 (1946), said:

"* * * Adoption is of civil law derivation, and was unknown to the common law. Adoption pro-

ceedings are the exercise of a power conferred by statute, and have no other sanction. * * *"

This decision was closely followed *In re Frazier's Estate,* 180 Or 232, 238, 177 P2d 254 (1947), and *Volz v. Abelsen,* 190 Or 319, 324, 224 P2d 213, 225 P2d 768 (1950).

Attachment under our statute also is a special, statutory remedy because it "had its origin in the customs of the city of London, and though such practice was very ancient, it was not of common-law origin but in derogation thereof * * *." *Edwards v. Case,* 78 Or 220, 228, 152 P 880 (1915). On the other hand, though replevin has been repealed in Oregon, our remedy of claim and delivery "is substantially the former action of replevin; changed, indeed, in its name, and modified in its form, but in its principles and objects identical." *Moser v. Jenkins,* 5 Or 447, 448 (1875).

In the tax field, the term "special, statutory proceeding" has been used to describe a summary proceeding first in *Smith Securities Co. v. Multnomah County,* 98 Or 418, 192 P 654, 194 P 428 (1921). Thereafter, this conclusion as to the nature of tax proceedings was used in various cases without citation of authority or discussion. *In re Gebauer Apartments, supra; Wadhams & Co. v. State Tax Comm., supra; State Tax Comm. v. Consumers' Heating Co.,* 207 Or 93, 190, 294 P2d 887 (1956). In only one case is any authority found outside Oregon, when *Wadhams & Co. v. State Tax Comm., supra,* cited *In re Blatt,* 41 N Mex No 9, 67 P2d 293, 110 ALR 656 (1937), and 51 Am Jur 701, Taxation § 774. Both of these authorities rely upon the constitutional rationale inapplicable in Oregon, as discussed later in this opinion. The

language of *Inland Nav. Co. v. Chambers,* 202 Or 339, 352, 274 P2d 104 (1954) bases this conclusion upon the limited scope of review under the 1939 act. In *Case v. Chambers, supra* at 694-6, the court found that this basis no longer applied, that the scope of review had become complete. Yet, as late as 1961, in *McCain v. State Tax Com., supra,* the special, statutory proceeding concept is again pronounced with a reliance upon *In re Gebauer Apartments, supra.* In the recent cases of *McCain v. State Tax Com., supra,* and *Wadhams & Co. v. State Tax Comm., supra,* tax proceedings were so found to be special and statutory on the apparently, current rationale that they paralleled those in divorce in being unknown to the common law, and the *Wadhams & Co.* case (202 Or at 137) cites the immediately preceding quotation from *Garner v. Garner, supra.* This rationale, as will be seen later, is the only one which is applicable under our constitution.

On the other hand, the general remedies—those that are not special and statutory—appear to be those which arose at common law and which inherently are part of our judicial procedure. See *Montesano L. Co. v. Portland Iron Wks.,* 78 Or 53, 70-1, 152 P 244 (1915); 14 Am Jur, 369, Courts, § 169.

██ Just as in the case of general and inferior jurisdiction, the fact that a statute prescribes certain procedures is not determinative of the nature of the remedy. Often statutes merely codify common law procedure, with some changes, and such codification does not result in the remedy becoming a special, statutory remedy. 1 Sutherland, Statutory Construction, 525, § 2043; 50 Am Jur 595, Statutes § 598. The distinction lies in the effect of the statute in the creation and existence of the remedy. A special, statutory remedy is one which, but for the statute, would

not exist and which arises out of, and is fully dependent upon, the statute. *Northcut v. Lemery,* 8 Or 316, 322 (1880). A general remedy, on the other hand, like a court of general jurisdiction, arises out of the common law, exists and operates independently of the statute, is explained, limited, or expanded by the statute, but is not dependent upon the statute for its existence. See *Grayson v. Grayson,* 222 Or 507, 513, 352 P2d 738 (1960).

### *Basis of Distinctions Between General and Special Remedies*

The rationale of the distinctions between general and special, statutory remedies based, as in Oregon, on the common law heritage of the remedy, or lack of it, and, in turn, therefore, between courts of general and inferior jurisdiction, lies in the philosophical genesis of our law. Underlying our legal system there is an understanding of a secular right to justice which arises from the existence of society itself, as some authorities say, from custom,[8] and this right does not depend upon legislative action to bring it into existence.[9] This understanding finds voice in Oregon in the original reception of the common law, discussed at greater length later.

Certain remedies are recognized as arising out of the common law and as such being inherent, customary rights obtainable from secular courts.

> "* * * In this sense the common law is the *lex non scripta,* that is, the unwritten law, which cannot now be traced back to any positive text; but is composed of customs, and usages, and max-

---

[8] Brown, *The Practice in the Court of Exchequer* 1 (2d ed London, 1725).

[9] This concept is reflected in the first lines of the Declaration of Independence.

ims, deriving their authority from immemorial practice, and the recognitions of courts of justice. "* * * it is the law of liberty, and the watchful and inflexible guardian of private property and public rights." Story, *Misc. Writings,* 505-6 (Boston 1852).

Other remedies do not arise out of the common law and are not inherent, customary remedies of our secular society. For these remedies to exist, statutes must first create the remedy and then assign it to a secular court. Because there is no inherent, customary right to the special, statutory remedy in our secular society, the court to which the remedy is assigned can only exercise such remedy to the extent that the statute created it and conferred it on the court. Because it cannot go beyond the creation of the statute, because it has no inherent power to exercise the remedy, the court is special, limited, and inferior. Thus, divorce and adoption, for instance, are special, statutory remedies, not because statutes merely regulate or codify them, but because they would not exist in our secular courts except for the statutes creating them. On the other hand, if a court is empowered to administer an inherent, customary, secular remedy, one known to the common law, then it is a court of general jurisdiction because its jurisdiction is not limited to the exact relief created by a statute but rather it is assigned a jurisdiction to administer an inherent remedy and has jurisdiction to the extent that secular society has customarily recognized a remedy to exist.

█ Other courts which have held the tax remedy to be special and statutory have founded such holding upon the rule that constitutional due process does not require that the administrative determinations be

subject to judicial review. 4 Cooley, Taxation, §§ 1612, 1618. This constitutional principle has been recognized lately in Oregon in the tax field. *Inland Nav. Co. v. Chambers,* 202 Or 339, 350, 274 P2d 104 (1954). However, as indicated above, it has not been used in Oregon as a basis for denominating the tax remedy as special and statutory. Instead, our courts have relied upon the theory of a lack of common law origin. *Wadhams & Co. v. State Tax Comm., supra.*

This constitutional due process rationale could not, and should not, be applied in Oregon for a number of reasons. First, since its enactment, the Oregon Constitution, not once but twice, and as part of the bill of rights and in the finance article, has required uniformity in taxation under the present provisions amended in 1917 and both equality and uniformity under the original provisions. Oregon Constitution, Art I, § 32, Art IX, § 1. These sections, without statutory pronouncements, are sufficient authority for the judicial correction of even the ordinary errors in tax assessment continuously recognized since early in our judicial history. *O. & W. M. Sav. Bk. v. Jordan.* 16 Or 113, 117 (1888), approving the same rule announced in *Rhea v. Umatilla County,* 2 Or 298 (1868) and *Poppleton v. Yamhill County,* 8 Or 338 (1880). For a full discussion of this early period, see *Strawn v. Commission, supra,* at 108-11. Secondly, the rationale of due process is not all inclusive in the determination of the nature of a remedy but merely goes to one possibly affected constitutional requirement. If a common law determination is vested in the administrative branch under appropriate safeguards, due process is not violated under this rule. If such administrative proceeding later is made a prerequisite for a subsequent common law action, the existence of the admin-

istrative proceeding *per se* does not reduce the common law remedy to one which is special and statutory. Instead, it merely modifies that common law remedy to the extent specified in the statute. Thirdly, while a judicial remedy may not be a requisite of due process, the lack of a due process question does not destroy the common law heritage of such legal remedy as does exist. Fourthly, the rule itself is more a matter of degree than of substance, for the courts always have intervened to prevent excessive abuse, interpreting the requisite excess in a multi-varied manner. Finally, the rationale of the rule has been based upon the assumption—false, as will be seen later—that a tax remedy was unknown to the common law. Its rationale has been that since no judicial tax remedy existed at common law and since such remedy is not required for due process, any judicial remedy which the legislature adopts is a creature not of the common law and not of the constitution and, therefore, is created wholly by the legislative act and is special and statutory. See *In re Blatt, supra* (110 ALR at 662).

Thus, while there is a seeming universality to the holding of the tax remedy in this country to be special and statutory, such determination is based upon two theories. One theory is that there is a lack of constitutional necessity for such remedy under the due process clause. This theory is inapplicable in Oregon under our constitutional provisions, as well as generally falsely premised for the result it is supposed to support. The second theory is that the judicial tax remedy has no common law background, is actually a premise of the first theory, and is the one adopted in Oregon because of our constitutional requirements as to taxation.

Having determined that in Oregon the nature of a

remedy, whether general on the one hand, or special and statutory on the other, is determined by whether or not it was known to the common law and the basis for that distinction, the next inquiry must be whether or not the remedy, and in turn the court, provided by the Oregon Tax Court Act, are a remedy and a court known to the common law.

## *What Common Law Received*

■ But before any review of the common law can be meaningful, we must define what is meant by a remedy or rule of law being known to or at the common law. We must define to what common law reference is being made and as of what date and to what extent it was received. Until recently, this whole problem of the historical and philosophical meaning of the reception of the common law in this state and nation has been a subject little studied or understood, and today it warrants far more concentrated effort before the complete picture of this reception can be seen clearly.[⑩] A basic difficulty lies in the problem of coordinating the intent and understanding of the recipients of that law with the actualities of the law received.

The common law was received into Oregon at the initiation of our civil government. At Champoeg, on July 5, 1843, the residents of this territory, in Article III, Section 12, of their original Organic Law, provided that "where no provision of said statutes [laws of Iowa Territory] applies the principles of common law and equity shall govern." Duniway and Riggs, *The Oregon Archives 1841-1843,* LX Oregon

---

[⑩] Julius Goebel, Jr., *King's Law and Local Custom in 17th Century New England,* 31 Col L Rev 416 (1931). M. T. Kaplan, *Courts, Counselors and Cases: The Judiciary of Oregon's Provisional Government,* LXII Oregon Historical Quarterly 117 (1961).

Historical Quarterly 211, 260 (1959). A year later, on June 27, 1844, the Legislative Committee of the Provisional Government enacted a statute making applicable here "the common law of England and principles of equity not modified by the statutes of Ioway [sic] or of this government and not incompatible with its principles."[①] Document 1207, Prov. and Terr. Government Papers. Again the next year, under the amended Organic Law which the Provisional Government adopted that year, the new House of Representatives, on August 12, 1845, re-adopted the laws of Iowa Territory as enacted at Iowa's first, territorial, legislative assembly, to the extent applicable to the conditions in Oregon and as modified by the Oregon provisional statutes, and in a separate section provided:

> "* * * That the Common Law of England shall in all cases govern where no Statute Law has been

[①] The derivation of the language of common law reception is of interest. In Article II of the original Organic Law, adopted July 5, 1843, the first sentence provided: "The inhabitants of the said territory shall [*always* inserted] be entitled to the benefits of the writ of habeas corpus, and trial by jury; of a proportionate representation of the people in the Legislature, and *of judicial proceedings according to the course of common law.* [Emphasis supplied]." Duniway and Riggs, op cit 257. This language came verbatim from the Northwest Ordinance of 1787, which was contained in the printing of the laws of Iowa Territory which they had on hand. The language of Article II apparently was deemed insufficient for the actual reception and Article II, Section 12, was also included. Here the language is "the principles of common law and equity shall govern." Id at 260. This language is not derived from the book of Iowa statutes and probably was the product of the Oregon draftsmen. In the 1844 enactment, the language is more flowery, "the common law of England and principles of equity." Document 1207 Prov. and Terr. Government Papers. It has the ring of a book title, which leads to conjecture as to the items of any scanty law library available to the settlers. Mrs. Kaplan discusses the early sources of law in connection with the earlier use of the New York code. Kaplan, op cit, LXII Oreg. Hist. Quart. at p 122, note. She does not suggest a title of a book as the source of the 1844 phraseology. The language of the 1845 act has caused concern because the "principles of equity" were deleted.

made or adopted." *Oregon Acts and Laws Passed by the House of Representatives At a Meeting Held in Oregon City August, 1845,* p 16.[9]

The congressional act creating the Oregon Territory, enacted on August 14, 1848, adopted the provisional laws. Deady, *Organic and Other General Laws of Oregon 1843-1872,* 60. Thereafter, the original state constitution re-adopted the territorial laws, thereby bringing the "Common Law of England" into our state law from the provisional law. Art XVIII, § 7; *Re Water Rights of Hood River,* 114 Or 112, 166, 227 P 1065 (1924).

To say that we have in Oregon the common law of England, except as modified by the laws of the first legislative assembly of the Iowa Territory to the extent that the latter were applicable to the Oregon conditions and as modified by Oregon provisional, territorial, and state statutes, is sufficiently vague to demand interpretation. Our frontier legislators who adopted this English common law for us had only the vaguest understanding of what they had adopted.[10] They knew that under English law they had certain rights and privileges, particularly trial by jury and habeas corpus.[11] They intended to retain all these

[9] MS at Oregon Historical Society. Microfilm of MS found in film 15, B2, Library of Congress Records of the States of the United States. These laws were first printed in 1921 by N. A. Phemister Co., New York. A printed copy is in the Oregon Supreme Court Library.

[10] "* * * a factor in the development of the law in pioneer American jurisdictions was ignorance." Roscoe Pound, *The Development of American Law and its Deviation From English Law,* 67 LQ Rev 49, 54 (1951).

[11] Note the concern with these particular rights in both the original Organic Laws of Oregon, Article II, set forth in Duniway and Riggs, *The Oregon Archives, 1841-1843,* LX Oregon Historical Quarterly 211, 225 (1959) and Resolution 5 of the Declaration of Rights in I *Journals of the Continental Congress,* W. C. Ford, ed., 69.

rights in this new country, to the extent that they became applicable to their circumstances. In some measure they intended to modify them by statute but, to the extent that they did not modify them, they wanted them retained as they were, as part of their American heritage.[⑨] In all this they had only the vaguest realization of the extent of those rights and privileges, both substantive and procedural.

Thus, a fixed and inclusive legislative intent at the time of the actual, initial reception of the common law in 1843, in all probability, did not exist.[⑩] Most likely the legislative intent in receiving the common law is well expressed in the broad language found in the contemporaneous letter of Jessie Applegate to J. W. Nesmith, the second elected judge of the Provisional Government Supreme Court, written on July 20, 1845,[⑪] in which he expressed his motivation as follows:

 "I hold the doctrine to be beyond controversy

[⑨] See Resolutions 5, 6, and 7 of the Declaration of Rights, adopted by the Continental Congress on October 14, 1774, *I Journals of the Continental Congress*, W. C. Ford, ed., 67, 69. Georgia was the only colony not present. In January, 1775, its assembly adopted identical resolutions, 1 Candler, *The Revolutionary Records of Georgia* 50-51.

[⑩] With good reason when one considers the rigors of frontier life and the lack of time for such philosophical problems. As pioneer Peter Burnett noted about himself and his early legislative colleagues: "In our then condition, we had but little time to devote to public business. Our personal needs were too urgent, and our time too much occupied in making a support for our families." Peter H. Burnett, *Recollections and Opinions of an Old Pioneer*, V Oregon Historical Quarterly 164 (June, 1904).

[⑪] Applegate Letters, Oregon Historical Society. That Applegate was referring as much to freedom from outside interference as to civil freedom from a tyrannous government becomes clear from the balance of his sentence, which reads: "and in a government like ours constituted upon the territories of two powerful nations without their knowledge or consent jealous of their rights —and not likely to forgive any devious invasion of them—I think that a power to control the too great assumption of the legislative power is so necessary that you will agree with me in the powers bestowed upon the supreme court."

that an independent and enlightened judiciary is the *greatest safeguard to the liberties of the people.* * * *" [Emphasis the author's]

By adopting the same common law which was the educational background of those likely to form that "independent and enlightened judiciary," the frontiersmen of Oregon were merely handing their familiar tools to this judiciary and expecting them to know how to use them for the desired result. The task of defining and enunciating the substance of that law so briefly described in its enactment was intended to fall to the courts, and this task has been undertaken by our Supreme Court in a number of opinions, leading among them being *Peery v. Fletcher,* 93 Or 43, 182 P 143 (1919); *United States F. & G. Co. v. Bramwell,* 108 Or 261, 217 P 332 (1923) and *Re Water Rights of Hood River, supra.*

Briefly, these cases hold that the Oregon settlers brought the common law with them as a birth right. *United States F. & G. Co. v. Bramwell, supra.* They adopted it as part of their laws, but it was only useful to the extent that it suited the conditions of their new home. *Re Water Rights of Hood River, supra.* Therefore, they limited the common law to that part which was suited to their conditions "and in harmony with the genius, spirit and objectives of American institutions." *Peery v. Fletcher, supra.* By the "Common Law of England" the settlers meant

" '* * * that general system of law which prevails in England, and in most of the United States by derivation from England, as distinguished from the Roman or civil law system.' " *United States F. & G. Co. v. Bramwell, supra* (108 Or 266-67).

Despite the inclusion of "equity" in the laws of 1843 and 1844 followed by their excission in the act of 1845,

the "Common Law of England" is held to include the "principles of equity." *United States F. & G. Co. v. Bramwell, supra.*

In *Peery v. Fletcher, supra,* this adopted common law has been held to embrace the English statutes modifying the common law enacted up to the time of the American Revolution. The usual date is July 4, 1776, the formal Declaration of Independence. In that case, Mr. Justice BEAN justified the selection of this date rather than an earlier one upon the very logical grounds that, since this state had no political existence until 1843, there was no reason for going behind 1776, as had been done by some of the eastern states.

The Oregon opinions are not clear as to the extent of the common law received in this state. Though a number of cases limit the reception to that part of the common law applicable to the conditions in Oregon at the time of its adoption, other decisions modify this rule in fact by adopting from time to time common law principles which would have been wholly inappropriate in the scattered habitations of 1843 but which were appropriate at the time of their actual reception by the court. *Knox v. Abrams,* 132 Or 500, 286 P 517 (1930) (motor vehicles) ; *State v. Huffman,* 207 Or 372, 297 P2d 831 (1956) *(coram nobis).*

All the Oregon decisions read together indicate that the common law of England as of 1776 underlies all our law, to be called upon as needed. It could be likened to the Columbia River flowing along our border. In 1843 the great river and its tributaries were scarcely called upon for more than the watering of man and animal. As our society grew and became more complex, we appropriated more and more of it for irrigation, power, and industrial uses. So with

the common law. It was there to be used as needed. In 1843, only its barest essentials were required for the log cabin frontier, but, as time has passed, more and more of it has become applicable to our conditions and has been adapted by the courts and the legislature for our use. Sometimes they have modified it, sometimes they merely have codified it, sometimes they have altered it, all as our needs and the growing complexity of our society has dictated. Such a view of our common law reception as adopting it at the beginning of our government to form a continuing, underlying foundation for our law seems consonant with both the general purpose of the frontier legislators and the actual usage made of the common law by our courts. In the context of this case, this common law reception means that the legislature may invoke in support of its intent, purpose, and objectives of 1961, not merely the common law applicable to the frontier community of 1843, but the entire common law of 1776 in its full maturity to the extent that it is applicable to the conditions of 1961 in Oregon.

### What Remedies are "In the Course of the Common Law"

In applying this concept of common law reception to our present case, it is not an exact counterpart of the procedural provisions of the Oregon Tax Court Act which we must find in the procedure of the common law. Rather, it will suffice to establish the judicial remedy in taxation as a general, common law remedy, if it had a counterpart remedy "in the course of the common law." Most of our general remedies today are not pure, common law procedures, initiated by writs and repleat with essions, replications, surrebutters, etc. Nonetheless, they are com-

mon law remedies because they are of the type and have the general result of those remedies which were part of the English common law of 1776. Divorce and adoption are not common law remedies, not because of some procedural variation, but because the entire remedies of divorce and adoption were unknown in the common law courts, were creatures of the ecclesiastical and civil law, respectively, and therefore are a part of our remedies only because our legislature engrafted them statutorily upon the basic common law of Oregon. *Garner v. Garner, supra; Williams v. Capparelli, supra.*

Hence, our inquiry into the common law does not seek the existence of a procedure which was identical or substantially identical to that now provided by the Oregon Tax Court Act, but rather it seeks the existence at common law in a common law court of an independent, judicial remedy which afforded the injured taxpayer substantially the same, basic relief now obtainable in the Oregon Tax Court. If there was such a remedy, then the remedy of the Oregon Tax Court Act is in the course of the common law. If it is in the course of the common law, then, this court is a court exercising a common law jurisdiction, its remedy is not a special, statutory remedy, and by earlier definition this court is a court of general jurisdiction, not a special, limited, and inferior court.

## The Problem of Abrogation

■ However, before any extensive examination of historical precedent at common law is warranted, it would be worthwhile to consider first whether or not the present statutory enactment constitutes an abrogation of any common law remedy which might exist.

While there is no clear-cut, definitive rule establishing when the common law is abrogated because the abrogation, in the final analysis, depends upon legislative intent, certain guides to legislative intent can be drawn from the cases, particularly *Silver Falls Co. v. E. & W. Lbr. Co.,* 149 Or 126, 150-51, 40 P2d 703 (1935), and the cases therein cited with approval.

In that opinion, Mr. Justice ROSSMAN finds that the manifest legislative undertaking to provide a complete code of laws on a particular phase of human conduct is some evidence of the legislative intent to abrogate the common law. But from *State v. One Ford Automobile,* 151 Ark 31, 235 SW 378 (1921), and *The People v. West Englewood Bank,* 353 Ill 451, 187 NE 525 (1933), he draws the cautionary rule that a statute should not be construed to abrogate the common law unless it is irreconcilably repugnant to that law. In the case at hand the court found that our Forest Protection Act was not repugnant to the common law principles of negligence with respect to forest fires.

In *Knox v. Abrams,* 132 Or 500, 506, 286 P 517 (1930), our apparently quite complete, motor vehicle code was found not to repeal the provisions of the common law which are not in conflict with it. In *Cordon v. Gregg,* 164 Or 306, 316, 97 P2d 732, 101 P2d 414 (1940), the same reluctance to find common law abrogation was expressed in the field of descent and distribution. The writ of prohibition was supported as part of our common law in *Southern Pacific Co. v. Heltzel,* 201 Or 1, 16, 268 P2d 605 (1954), applying the same reluctance to abrogate ancient, procedural principles as had been applied to common law, substantive rules.

In the tax field, as pointed out in *Strawn v. Commis-*

*sion, supra* (1 OTR 125 et seq.), the earliest judicial review of taxation was assumed as part of the general, nonstatutory procedure of the state for the first forty-eight years of the state's history. Though the chosen remedy, the writ of review, was apparently the wrong procedure, it was generally considered that, even without a statutory procedure, a remedy did exist. Since the remedy was nonstatutory, it must have arisen from our common law foundation.

From 1907 onward, tax review procedure was covered by statutes, but, as discussed in the *Strawn* case, there was no apparent legislative intent to contract tax review. On the contrary, the legislature each time sought to broaden it. These statutory amendments of the common law did not abrogate it *per se*. 1 Sutherland, Statutory Construction 525, § 2043 (3d ed 1943). Such legislative, procedural alteration of a remedy "known to the common law" alone, without a clear intent to repeal the remedy itself, does not constitute abrogation. Nowhere in the procedural tax statutes has such legislative intent appeared expressly or by such clear implication as to warrant that conclusion. The only time that the repeal of a remedy can be found is when the legislature clearly seeks to deny the people the basic remedy which the common law afforded. See *Southern Pacific Co. v. Heltzel, supra*. If such intent could be gleaned from nothing more than the amendment of procedure, then all Oregon remedies would be purely statutory. When, as in the field of taxation, the legislature merely supplants the common law procedure with a statutory one arriving at substantially the same remedial result, the common law is only in abeyance and then only to the extent that the statutory procedure actually takes its place. *Knox v. Abrams, supra*.

The closest the prior tax statutes have come to abrogation are the provisions making the statutory remedies exclusive or those directing them to be summary in manner. These features alone do not warrant the conclusion of abrogation. Particularly is this true in light of the peculiar nature of tax litigation and of the problems of taxation itself. First, each tax is different and, as the administrative procedure for its collection varies, so, too, must the procedural steps for judicial review. This was as true under Henry II as it is today. Secondly, the legislative purpose in enactment of these limitations on review appears generally to be more associated with the intent to speed the collection than to inhibit or constrict the citizens' right to judicial review. The fact that for a purpose other than common law repeal a particular remedy is prescribed as exclusive does not abrogate the common law.

Thirdly, as noted briefly earlier, the courts long have recognized many inherent rights to judicial relief beyond the procedures expressly described and made exclusive by statute. For example, equity has never relinquished its powers to right a tax wrong regardless of these exclusive statutes. *Dant & Russell, Inc. v. Pierce, supra,* and other cases above cited. The extraordinary remedy of mandamus has been used in *Central Pacific Railroad v. Gage, supra; State ex rel Galloway v. Watson, supra; State ex rel v. Melville, supra.* Even the procedure of declaratory judgment has been permitted. *Redfield v. Fisher, supra.* With the common law in our sense including the provisional remedies and equity (*United States F. & G. Co. v. Bramwell, supra*), it is clear that it has not been wholly abrogated in the tax field. Rather it has been amended from time to time, and to the extent of their

applicability those amendments have superceded comparable, common law remedies, if any.

■ Finally, to the extent that the common law remedy may have been changed or partially abrogated by prior statute, it has been reinstated when that statute has been repealed. ORS 174.080; *Strickland v. Geide*, 31 Or 373, 49 P 982 (1897). This confirms the theory of the continuous flow or availability of the common law, the theory that it underlies our statute law and is available when no statute exists. This means in the instant analysis that, even if the prior statutes were held to result in such abrogation, which in fact they probably did not, nonetheless with their repeal the common law is reinstated and such abrogation therefore is immaterial. It must be the present law which forms any basis of common law repeal.

■ The Oregon Tax Court Act does not purport to abrogate the common law. ORS 305.410 makes the tax court's jurisdiction exclusive, but, as discussed earlier, the most logical interpretation of this statute renders it a catch-all, a legislative expression of the expansive purposes of the act, rather than an attempt to abrogate existing remedies. ORS 306.580 similarly does not purport to abrogate the common law but merely to make the statutory remedies exclusive in those cases where they are available. The remedies in taxation are no longer summary, limited reviews of the record but rather are independent, plenary, *de novo* proceedings comparable to general common law remedies in other fields. *Strawn v. Commission, supra.* As in the case of the motor vehicle code, the delineation of remedies in the Oregon Tax Court Act is not an abrogation of the common law but a statutory modification of that law just as has occurred in the case of

most of the common law remedies applicable in Oregon. *Knox v. Abrams, supra.*

■ Since the common law has not been abrogated by the Oregon Tax Court Act and the common law determines both the nature of the remedy and jurisdiction, we now must turn to that law for guidance. To this point we have found that the legislative intent in enacting this tax court act, as shown by the act as a whole, by its legislative history, and by its specific provisions, was to create a court of general jurisdiction. We have found that the legislature determines the general or inferior nature of a court not by precatory statements but by the remedies which it assigns to the court. We have found that a court of general jurisdiction is one empowered to invoke the common law remedies, not one exercising only special, statutory remedies. Heretofore, the circuit court has exercised general remedies in taxation as a court of general jurisdiction but has been an inferior court when invoking the statutory remedies because the latter remedies were held to be special and statutory. We have found that unlike the circuit courts this court would not have express general jurisdiction, if its remedies are found to be special and statutory. Special statutory remedies are defined as those unknown to the common law. The common law as received in Oregon is all that common law of 1776 from time to time appropriate, and when we say that a remedy is known to common law, we refer to the remedy as a whole and not the various details of procedure. Finally, we have concluded that the present tax law does not abrogate any common law remedy, though it does modify it. We now turn to study the common law of England of 1776 because, if in England in 1776 there was a remedy at common law in a common law court

which provided relief to a taxpayer when he was unjustly taxed by permitting the court to modify or reverse the assessment of the taxing official or, if the tax was just, to affirm the assessment, then, the comparable remedy in the Oregon Tax Court is not a special, statutory remedy but is one known to the common law. If there was a common law court exercising this remedy, then, the Oregon Tax Court is its successor and as such a court of general jurisdiction. If from the common law such a general remedy can be discerned and such a common law heritage of this court be established, making its remedy general and this court one of general jurisdiction, then, though other interpretations are feasible, such interpretation is reasonable and we are admonished to apply it as a reasonable intendment in order to accomplish the apparent legislative purpose, intent, and objectives in the creation of this court.

### Tax Court's Common Law Heritage

█ The common law basis for a tax court is readily found in the English Court of the Exchequer, one of the three great courts of the common law. This court was devoted from earliest Norman days to the problems of the king's revenue and is the obvious predecessor of any judicial tax court in Anglo-American, common law jurisdictions. Exercising remedies which, though peculiar to it, were a blend of the legal and equitable remedies used in the other courts of the common law and equity, the existence of this court and its remedies appears to establish the common law background of the Oregon Tax Court.

█ That heretofore in decisions under prior acts the remedies in taxation have been held to be special, statutory remedies unknown to the common law, that

tax tribunals have been deemed limited and inferior, and that the obvious common law heritage of our courts sitting in tax cases has been passed over, can be attributed to three factors. The first factor, discussed at length in *Strawn v. Commission, supra,* was the limited court review permitted by the courts under the prior acts. The reasons for those limitations and the change which has occurred in the tax climate of Oregon culminating in the Oregon Tax Court Act are fully considered in the *Strawn* case. It suffices here to rely upon that decision to reach the conclusion that, under the Oregon Tax Court Act, the legislature intended to establish in this court the broadest relief reasonably to be available in tax questions and that the legal, statutory, and administrative conditions have so changed as to make such relief in a court of general jurisdiction practical and effective. Unlike the review under prior statutes, the present proceedings are not limited to a few questions and to a review of jurisdiction but are in general form the plenary, *de novo,* common law remedies long available in the Exchequer.

The second factor which led to the passing over of the common law heritage in tax adjudications was the concept of special, statutory review developed under the federal system long before the present need for more than cursory, state adjudication had developed. In Oregon, the early state tax cases were neither frequent nor important to the bar and the courts generally. *Strawn v. Commission, supra.*[19] The same situation prevailed in other states. It was not

---

[19] For a popular treatment of this point, see a review of the general importance of taxation in the economy in an article by Lancaster Pollard, entitled "Oregon's 'Tax Troubles' All Began With 'Uniform' Property Assessment From Constitution," in *The Oregonian* of Monday, March 4, 1963, p 8. It contains figures on the extent of the tax burden through the earlier years.

until the federal system of taxation and its adjudication process had grown to full size and matured that any serious consideration was given to the late-blooming burden of state taxes. In the meantime the contraction of judicial review of what was called in the *Strawn* case the second period, 1917 to 1953, had occurred.

Because of the nature of federal law, this federal system, already firmly established by the time the states became deeply involved in tax litigation, had to be based upon concepts inapplicable to state law and state courts. There is no federal common law. *Erie R. R. Co. v. Tompkins,* 304 US 64, 78, 58 S Ct 817, 82 L ed 1188 (1938). Therefore, federal tax adjudications, as all federal remedies, are statutory. In addition, what is now the federal tax court is merely a continuation of the earlier, clearly administrative board of tax appeals and it continues to be expressly a part of the executive branch of government. IRC 1954 § 7441. Because it is an instrument both federal and executive in character, its remedies also are purely statutory. It is most natural that the federal concepts, more matured and given greater expression in judicial decisions, should be taken over automatically by state courts and, when combined with the practical problems which were constricting judicial relief in taxation in Oregon and with constitutional concepts which, though espoused in other states, are of doubtful validity and application and are inapplicable in Oregon, this federal concept should aid in justifying the retention of judicial review in taxation within narrowly defined, statutory provisions.

But there is a very fundamental distinction between state and federal courts. The residual judicial power, the common law power, rests in the state court system.

A state, general, trial court has the common law remedies and is a court of general jurisdiction capable of exercising those remedies inherently. On the other hand, the federal courts, in this sense, are of special or limited jurisdiction and must turn to a statute for all their powers, rendering their remedies wholly statutory. *Chicot Co. Drainage Dist. v. Baxter State Bank,* 308 US 371, 376, 60 S Ct 317, 84 L ed 329, 333 (1940). If a remedy in taxation existed at common law and is not abrogated by statute, that remedy, modified by any applicable statute, exists in the state court. But in a federal court, if a federal statute does not grant to it a tax remedy, no such remedy can be invoked inherently, as being from the common law.

This distinction is all the more important in Oregon because, unlike the federal remedy, the tax remedy adopted by the legislature in the Oregon Tax Court Act was clearly a judicial remedy to be exercised by a court expressly part of the judiciary, rather than an administrative remedy to be exercised by a board of the executive branch. In this respect, the Oregon Tax Court is unique among state and federal tax tribunals. As noted earlier, at the time of its adoption of this remedy, the legislature expressly rejected a court or board of the type provided by the U. S. Tax Court statutes. This legislative choice is entitled to considerable weight in the consideration of this court's jurisdiction. It and our residual, common law heritage distinguish this court and its remedy from the federal remedies and belie any transfer to this court of the federal concept that tax remedies are special and statutory.

■ The third factor which has prompted the treatment of tax remedies as special and statutory and of tax courts as special, limited, and inferior in jurisdic-

tion has been a basic misunderstanding of the position of the Court of Exchequer in the common law system, a misunderstanding which time and considerable, recent scholarship gradually are clearing away.

In our situation, it may not be unjust to trace this misunderstanding back to Blackstone. In his *Commentaries on the Laws of England,* he said concerning the Exchequer:

> "The court of exchequer is inferior in rank not only to the court of king's bench, but to the common pleas also: \* \* \*. It is a very ancient court of record, set up by William the Conqueror as a part of the *aula regia,* though regulated and reduced to its present order by King Edward I; and intended principally to order the revenues of the crown, and to recover the king's debts and duties."[9]

The understanding of the Exchequer as an inferior court, for which the learned knight offered no citation of authority, and which he appears to contradict in the next sentence by showing it to be a court of record,[9a] now appears to be clearly incorrect. His misunderstanding can be traced to three logical bases: First, the influence of Coke, secondly, Blackstone's preoccupation with the private law applicable in his own Court of Common Pleas in which he was a judge, and, thirdly, a tendency of 17th and 18th century authors to project their own circumstances backward historically as immutable. As Dean Pound noted, Coke, upon whom Blackstone relied, had an aversion

---

[9] 2 Cooley's *Blackstone's Commentaries* 42 (Chicago 1871); 3 Lewis' *Blackstone's Commentaries* 1057 (Phila. 1898); 3 Christian's *Blackstone's Commentaries* 44 (Portland 1807); All three show the citation as III Blackstone, *Commentaries on the Laws of England* 44.

[9a] See III *Blackstone Commentaries* 24, defining a court of record as one whose record cannot be impeached collaterally, as in our courts of general jurisdiction.

to the courts of equity.[20] The Exchequer had an equity side and Coke's aversion for equity may well have carried through to Blackstone's treatment of the Exchequer. In addition, Blackstone obviously was concentrating on the law of the general, private person with which he dealt as a judge of Common Pleas. As is so frequent in the treatment of the Exchequer's revenue jurisdiction by nontax lawyers, he dismissed this jurisdiction as clear and not of sufficient interest for discourse.

Thirdly, that the Court of Exchequer was an inferior court, as Blackstone has described it, has been noted by recent scholarship as an example of the projection of the conditions of his day as immutable.

"We turn to some of the later authorities [those of the 17th and 18th centuries] and find at once a theory of the competence of this Court, based on contemporary practice, stated almost as if it had been held for gospel from the beginning of time. It is a common criticism of the lawyers of the seventeenth and eighteenth centuries that they evolve a theory from the settled practice of their own day and father it upon a time when there was little theory and less settled practice, but a great deal of active evolution: * * *.
"* * * * *

"Blackstone is fuller and more historical, though he is not altogether immune from the criticism already mentioned. * * *."[21]

This and other recent studies do not support an inferior status for the Court of Exchequer but rather place it as a co-equal member of the three, great, common law courts. It is true that the stature of the respective common law courts varied from time to time

depending upon the caliber of the judges. While this affected their public esteem, it did not affect their legal status as common law courts of general jurisdiction. Because the comments of Blackstone have colored our thinking to some extent, a brief review of the genesis, status, and remedies of the Exchequer, with special reference to more recent authorities and the actual records of antiquity appears appropriate. From this review it will be seen (1) that the Exchequer had the same common law origin and status as the other common law courts, (2) that its judges and judgments were co-equal with those of the other common law courts, (3) that its remedies in revenue cases were the common law in this field and were basically the same remedies as are available in this court, and (4) that the Exchequer retained its common law supremacy in revenue cases until long after 1776, while acquiring a common plea jurisdiction in addition.

### *The Origin and Status of the Court of Exchequer*

· · ■ The origin and status of the Court of Exchequer was the same as that of the other common law courts. Its history shows that, from its very beginning, it was a court of original, general, trial jurisdiction and that it retained this jurisdiction in revenue cases throughout its history. For a period from 1300 to 1579, its jurisdiction was limited largely to revenue cases and its judges did not have the same social status as the other common law judges, but well before 1776 it had regained its full status as a common law court not only in revenue cases but, through the writ of quominus, as a general, civil court as well.

As to the origin of the court, it will be recalled that our courts of common law, including equity, find their origins in the early Norman monarchs and the

*aula regia* or *curia regis.* In Anglo-Saxon times, though the king dispensed justice personally from time to time, the judicial system was essentially a local system, a district by district conglomeration of local and customary law dispensed by courts of varying and often vague jurisdictions.[20] After the Battle of Hastings in 1066, a gradual change took place. The Norman and Angevin kings, faced with the problem of controlling the conquered country, seized upon the administration of justice as a means of binding the populace to them, particularly the more influential people. During the 12th and 13th centuries, from William I to Henry III, the royal courts of justice gradually took precedence over the older, local courts to the benefit of both the king and the subject.[23] The king gained by concentrating more control in his hands and the subject benefited by having available a better, more complete brand of justice.[24]

At first, and for a long time in major cases involving those who held their feudatories directly from him, the king sat in personal judgment, aided by his council, the *curia regis.*[25] Because of the burden this placed upon the royal person and because crown business often required his being in Normandy or elsewhere, the king's presence soon was taken by a substitute, the justiciar.[26] Gradually, the King's Court, known

[20] I Holdsworth, *A History of English Law,* 38 et seq, (7th ed Boston 1956).

[23] Id 4-5.

[24] Id 47-48; for a discussion of the reasons for the rise of royal justice, see Potter, *Historical Introduction to English Law,* 106-7 (4th ed London 1958).

[25] Actually, the king presided as the president of the court. The judgment was rendered by the members, as in the communal court. I Holdsworth, op cit 40.

[26] Originally the justiciar merely substituted for the king during his absence from England, but under Ranulf Flambard this office became that of the first minister. Id 36.

as the court *coram rege,* as distinguished from the great council, became a smaller, separate body composed of "the great officers of the household, the justiciar, chancellor, treasurer, and barons of the exchequer, with such of his clerks as the king might summon."[27] The king could summon all his liege lords to his council, but as a practical matter this became unnecessary in the transaction of the general, court business. Instead, the court *coram rege* sat with the king presiding, or in his absence the justiciar.[28]

"As it is not a kingdom without subjects, so he is not a King without revenues."[29] From the very beginning of Norman rule the functions of its treasury, the *Thesaurius,* is known.[30] More important, and possibly an integral part of the Conqueror's original government,[31] was the revenue office, the Exchequer, so named for the chequered cloth or table used there to aid in the counting of receipts.[32]

[27] Preface to Vol. II, *Stubb's Edition of Benedictus,* p 74.

[28] I Holdsworth, op cit 34-35.

[29] The words of Baron Clarke in *An Information Against Bates,* Lane's Reports 23, 145 English Reports (Exchequer) 267 (1606).

[30] Bigelow, *History of Procedure in England,* 103 (Bost. 1880).

[31] *Blackstone's Commentaries.* See note 19.

[32] I Madox, *History of the Exchequer* 161 (London 1769). Though Madox set the common meaning of the word, Gilbert, in his work *The Court of Exchequer,* p 1 et seq. (London 1758), notes the connection between the Norman and English exchequers and cites Basnage in his *Custumary of Normandy* as attributing the name to the German word "Skecken," translated as "send," "because this Court was composed *de Missis Dominis,* or of such Great Lords as were particularly sent for, * * *." p 2. Gilbert also relates that the Norman Exchequer "was the ancient and sovereign court * * *, to which they appealed from all inferior courts and jurisdictions; it being the grand Court of the Duke." p 1. Though Gilbert seems to imply a Norman origin to the Exchequer, Holdsworth, op cit 43, cites Poole, *The Exchequer in the Twelfth Century* 57-59, as settling the origin of the Scaccarium in the reforms of Roger, Bishop of Salisbury,

At the outset the Exchequer was a part of the *curia regis,* as was the court *coram rege.*[38] With some slight change in personnel, if any,[39] it handled the business of revenues, accounting for the king's lands and income and deciding who owed the king how much, at what time, and why. These questions involved issues of tax law and general law, and from the beginning the Exchequer was engaged in deciding essentially legal cases involving the royal revenue.[40]

The justiciar began his decline with the elevation of William Longchamp, Bishop of Ely, to the chancellorship in 1189,[41] and coinciding with the decline of the justiciar occurred the separation of the court system in England. Potter in his recent work states that the Exchequer was the first court to separate from the *curia regis,* and bases his conclusion on the *Dialogus de Scaccario*[42] of Richard Fitz Neal, Bishop of London, written about 1178-79, at the end of Henry II's reign, pointing out that by this time the *cursus scaccarii* had become a defined and recognized procedure.[43] Other writers find it difficult to position the Common Pleas and the Exchequer in the chronological order of their

which he then transported to Normandy. Generally, Roger is believed to have reformed rather than originated the Exchequer and the financial administration of the Plantagenets. *The Dialogus de Scaccario* is the authority for Poole's statements.

[38] I Holdsworth, op cit 38.

[39] "It may sometimes be difficult, especially in the twelfth century, to distinguish between the Exchequer and the Council, if there were any great distinction in point of *personnel.*" Bigelow, op cit 91.

[40] I Holdsworth, op cit 238.

[41] Bigelow, op cit 87, n 1.

[42] For a rather complete discussion of the *Dialogus de Scaccario* see Bigelow, op cit 103-23. Also see discussion of the *Dialogus de Scaccario* in II *Select Essays in Anglo-American Legal History* 32, 33, 74. (Boston 1908).

[43] Potter, op cit 117.

separation from the *curia*[39] and generally conclude that the first third of the thirteenth century saw the emergence of both the Common Pleas and the Exchequer from the same parent and at substantially the same time.[40]

■ Some of the difficulty in discerning the rise of the Exchequer as a court lies in its nature as an administrative, as well as a judicial, department, a problem unknown to the other common law courts.[41] Neither Glanvill nor Bracton recognized it as a court of law,[42] though by Bracton's time the Exchequer records show that it was, in fact, hearing pleas connected with its own business and that of its officials.[43] The undifferentiated state of English courts in their day makes understandable their failure to identify the Exchequer as a separate court. Soon thereafter in Fleta and then in Britton the Court of the Exchequer is described as a court which the king directed "to hear and determine all causes relating to our debts and seignories and things incident thereto * * *."[44] The confusion between the administrative and judicial functions continued until the clear separation of the Exchequer of Receipt, the administrative and fiscal department, from the Exchequer of Pleas, the law court.

A second cause of confusion lies in the poor differentiation of the separateness of the various courts on the early plea rolls. In addition, writers have given diverse meanings to the term "ad Scaccarium," Coke among others apparently interpreting it as a place of

---

[39] Bigelow, op cit 91.
[40] I Madox, op cit 796.
[41] I Holdsworth, op cit 44.
[42] Id 231, and Jenkinson and Formoy, op cit xiii.
[43] 177 Law Times 404 (June 9, 1934).
[44] Jenkinson and Formoy, op cit xiii, quoting Britton.

meeting.[63] Undoubtedly, other courts met in the Exchequer at Westminster, as it apparently was commodius for the purpose.[64] Because frequently the personnel of the courts was the same or similar in this period, it is difficult from the first glance at the various rolls to tell which court is meeting.[65]

Gradually, as the thirteenth century passed, the separate nature of the three common law courts became clearer, though their jurisdictions overlapped as they grew. During this early period the Exchequer developed so much business as a court of nonrevenue, civil causes that Edward I took action at the end of the century to protect his revenue collection from the delay being caused by the heavy, civil docket. In 1300, with the Statute of Rhuddlan, he effectively limited the jurisdiction of the Exchequer to issues touching the revenue,[66] though various, civil cases, especially those of merchants, found their way to this court by special, royal grace.[67]

■ Thus, by the early 14th century the three common law courts were established and operating in their respective spheres as relatively equal, separate entities fathered by the same parent.[68] The Court of Com-

---

[63] Id xiii, n 1.

[64] I Holdsworth, op cit 233, citing Tout, Edward II, 56.

[65] Bigelow, op cit 127-8. Note also that all the judges met upstairs in the Exchequer to discuss hard or major cases. This meeting gradually became the separate appellate court of Exchequer Chamber.

[66] For a discussion of this restriction to revenue jurisdiction, see Jenkinson and Formoy, op cit xciv et seq. The statute name has been variously spelled. Holdsworth uses "Rutland." Here we have used the one found in Jenkinson and Formoy, op cit.

[67] Radcliffe and Gross, *The English Legal System* 57 (3d ed London 1954); I Holdsworth, op cit 235.

[68] "The three old courts—the three superior courts of common law, King's Bench, Common Pleas and Exchequer—have grown

mon Pleas, stationary at Westminster pursuant to the
Magna Carta, had jurisdiction generally of cases be-
tween subjects.[36] The Court of the King's Bench, which
was the last to acquire separate status, had jurisdic-
tion over matters touching the king's peace.[37] The
Court of the Exchequer was the court of the king's
revenue and prerogatives.[38] These are the three great
courts of common law, which sprang from custom,[39]
and in which, together with the Court of Chancery,
our law is deemed to have originated and developed.
When we say that we have received the "Common
Law of England," we mean, as pointed out in the fore-
going quotation from *United States F. & G. Co. v.
Bramwell*, supra, the system of law and procedure
developed in these courts and of which these courts
were a part.

### Status of Exchequer Judges

 In status, the Exchequer judges began perhaps
somewhat above the judges of the other common law
courts. In its earliest days and even after its separa-
tion, the barons of the king—the mighty men of the

in power and dignity. * * * The line of demarcation between
the provinces of these three courts is not so plain as once it was,
* * *. But to one or the other of these three courts goes almost
all of the civil litigation of the realm—all that the local courts
are incompetent to entertain. The King's Bench is the supreme
court for criminal cases, and the Exchequer still keeps its monoply
of all cases touching the royal revenue. These courts have by this
time become purely judicial institutions, they have little or nothing
to do with the governmental work; it is their function to hear
and determine causes according to the law of the land, * * *."
Maitland, *The Constitutional History of England*, 209-10 (Cam-
bridge 1955).

[36] I Holdsworth, op cit 56.

[37] Id 206.

[38] II Madox, op cit 23-24.

[39] Brown, op cit p 1.

realm—sat there as a committee of the *curia regis.*[55] Throughout its history its judges were accorded "the unusual dignity of Barons,"[56] its presiding judge being the Chief Baron. Not only was the Exchequer a law court but it also had administrative duties requiring fiscal experts. For sometime during the middle ages both lawyers and expert laymen sat as barons.[57] To some extent its legal experts served in dual capacities. In 1303 William de Carleton was both a justice of Common Pleas and Chief Baron.[58] The Chief Barons were usually lawyers[59] and, during the reigns of Henry IV–VII, they were also justices in Common Pleas.[60]

The Court of Exchequer diminished somewhat in social standing in the 14th and 15th centuries, as the professional bar grew and created its status symbols. This decline in status among lawyers resulted from the Statute of Rhuddlan in 1300 restricting the Exchequer to revenue cases and from the presence among the barons of laymen and men who were not serjeants at law.[61] During the 15th and 16th centuries the law barons became more and more concerned and specialized in legal matters[62] and this concentration of the law barons on legal matters shifted the administrative and fiscal concerns of the Exchequer to the

---

[55] 3 Blackstone 44; Radcliffe and Gross, op cit 52.

[56] Potter, op cit 117.

[57] Potter, op cit 118.

[58] II *Select Essays in Anglo-American Legal History* 209, 215, Inderwick, "The Common Law Courts as established under Edward I."

[59] I Holdsworth, op cit 235.

[60] Id. "In Edward II's reign Hervey of Staunton was successively the Chief Judge in the Eyre of Kent held in 1313-1314, Chief Baron of the Exchequer, and Chief Justice of the Common Pleas."

[61] Id 236.

[62] Id 236-37.

Cursitor Baron, a position created in 1323.[63] Finally, in 1579 the Queen required that all law barons be appointed from the serjeants.[64] This resulted in the nonlegal Exchequer concerns becoming the concern of the Cursitor Barons completely. Thereafter the law barons and the other judges were legally and socially equal and the barons went on circuit as judges of assize.[65]

## Status of Exchequer Judgments and Decrees

■ The status of the judgments and decrees of the Exchequer as those of a superior, common law court is shown by the appellate process. Appeal from inferior courts lay to the King's Bench,[66] just as they lie to the circuit court in Oregon. Appeal from the

---

[63] Holdsworth attributes the rise of the Cursitor Baron to the increased status of the *puisne* barons. I Holdsworth, op cit 237. Tanner says the rise in the *puisne* barons' status occurred because of a need for judges to handle the increased law business of the courts generally. Tanner, *Tudor Constitutional Documents* 342, quoted in Pound and Plucknett, *Readings on the History and System of the Common Law* 96 (3d ed). Tanner cites Harrison as attributing it to the need to employ an excess of lawyers then at Westminster. A more likely reason for the rise of the Cursitor Baron is the natural concentration of the law barons on legal matters, including the expanding civil business of the court, thereby requiring someone else to mind the collection of royal revenue.

[64] In 1579, when Elizabeth created Robert Shute the Second Baron, she provided in his patent that he should be "of the same order, rank, estimation, dignity, and eminence as any *puisne* judge of either of the other two courts." Tanner, op cit; I Holdsworth, op cit 236-37. Holdsworth here finds the status of barons still retaining some of the older flavor because he finds later statutory expressions limiting the judicial function to " 'Barons being of the degree of the coif.' " (31 Charles II. c 2 § 3; 56 George III. c 100 § 1). Though Holdsworth does not so conclude, the statutory distinction can be based upon the distinction between the *puisne* barons and the Cursitor Baron.

[65] Tanner, id 342. For a review of the outstanding 18th century barons, see XII Holdsworth, op cit 455 (London, 1938).

[66] I Holdsworth, op cit 213-17.

Exchequer and in some cases from the King's Bench lay in the Exchequer Chamber on the law side[66] and to the House of Lords on the equity side.[68] Thus, the Exchequer's appellate process was as direct to the highest court as was that of any common law court. Had the Exchequer been an inferior court, as the King's Bench unsuccessfully contended in 1338,[69] the appeal would have lain in the King's Bench. The fact that it did not, but rather lay in a court having by 1600[70] appellate jurisdiction over the King's Bench belies any assertion of Exchequer inferiority.

### Common Law Procedure in Taxation

From the very start, the Exchequer of Pleas was the only court which had jurisdiction in revenue cases.[71] The earliest, extant pipe rolls of Exchequer pleas contain many revenue cases tried in the Exchequer during the 12th and 13th centuries.[72] They show that, long before its departure into regular, civil litigation by the writ of quominus, this great, common law court was deeply engaged in litigation involving royal revenue and prerogatives. The revenue jurisdiction of the Exchequer grew in the same manner as other common law jurisdictions grew—from the subject's, inherent right to justice.

In the Exchequer of Pleas we find a court in which the procedure was somewhat different from that of its two common law fellows. Because originally the chancellor sat in the Exchequer and it later developed its

---

[66] Id 242.
[68] Id 372.
[69] Id 243.
[70] Id 244.

[71] *Information Against Bates, supra;* Jenkinson and Formoy, op cit xc; *The Attorney General v. Halling,* XV M & W 687 (1846); I Holdsworth, op cit 238. See also Brown, op cit 11.

[72] Jenkinson and Formoy, op cit xc, c.

own chancellor,[73] the Exchequer proceeded by equity as well as by law.[74] Potter describes it as the precursor of equity.[75] As it grew from a committee of the *curia,* to an administrative and judicial department, to a separate common law court, to a court with civil jurisdiction, and finally contracted again to a court of revenue, the Court of the Exchequer developed the *cursus scaccarii,* which in revenue cases blended both equitable and legal remedies.[76] The processes of the common law and equity courts grew up together so that it is not surprising that in the Exchequer, with both law barons and its own chancellor, the *cursus scaccarii* partook of both common pleas and chancery procedure. Furthermore, it is only natural that, where the King's revenue is concerned, there would be available to him the full powers of all the courts. As the revenue laws changed, the procedures for judicial review changed with them, but the common law course of the court continued.

The *cursus scaccarii* proceeded by both writs and the less formal bills.[77] In revenue cases the procedure sometimes contemplated a jury[78] but more often the

---

[73] Holdsworth, relying on Poole and Madox, places the separation of chancery and the exchequer in 1199 and the creation of the Chancellor of the Exchequer in 1248. I Holdsworth, op cit 37, 44.

[74] "It has been in the constant habit of proceeding both after the forms of the other courts of common law, and in the manner also of a court of equity. The 'course of the Exchequer' involving both these modes of procedure, is part of the ancient and general law of the realm." Chief Baron Pollock in *Attorney General v. Halling, supra,* at p 693. I Holdsworth, op cit.

[75] Potter, op cit 118.

[76] Carter, *A History of the English Courts* 51 (7th ed London 1953).

[77] Jenkinson and Formoy, op cit, cxxiv and cxxviii.

[78] Pipe rolls 20, 21 Henry III no. 17 "*Mandatus fuit vicecomti Berk' quod sumoneret per bonos sumonitores. xij liberos et legales homines * * * ad recognoscendum super sacramentum suum * * *.*" Id 5.

case was tried before the barons alone. The barons sometimes rode circuit throughout the country[79] but more regularly held court at Westminster. Though the nature of the controversy varied, the ultimate determination was that the subject was, or was not, indebted to the sovereign.[80] The assessment had been made before the suit[81] and the subject sought its reduction or elimination, or the sheriff or other collector who had been charged with its collection,[82] sought to excuse it or be relieved of the burden. The subject of the suit or action was the liability for tax. The controversy arose over the law, or the facts, or a combination of both. There was a usual form[83] for the general proceeding, but, in aid of this form of action, the court had the powers of equity. For instance, it was here that the English bill of information arose.[84]

▮ An analysis of the revenue proceedings in the Exchequer of Pleas discloses a close similarity to the proceedings before the Oregon Tax Court. The subject of controversy, the general procedure, and the relief afforded are all found in substance in this court's proceeding. While the details of the bills and writs, and certainly the taxes themselves, are not identical, Oregon Tax Court proceedings bear the same similarity to those of the Exchequer that the present day common law actions and suits in circuit court bear to the actions and suits at common law in the other courts of 18th century England.

---

[79] Jenkinson and Formoy, op cit cxxxv; I Madox op cit 193.

[80] Plea roll, Hilary Term, 19 Edward I, no. 181, re: William de la Rokele. Id 131.

[81] Id XLIII et seq.

[82] I Madox, op cit 732.

[83] Bigelow, op cit 115.

[84] Radcliffe and Gross, op cit 150.

## Expansion of Jurisdiction

■ Throughout the middle ages, the English courts encroached upon each others' jurisdictions, and particularly upon the lucrative jurisdiction of Common Pleas.[85] Just as the King's Bench used the fiction of the Custody of the Marshal of Marshalsea and of trespass to spearhead its invasion of Common Pleas,[86] the Exchequer used the writ of quominus.[87] This writ was based upon the fiction of the plaintiff being a debtor of the king and seeking royal aid in collecting from his own debtor so that he could pay the king. As Carter put it:[88]

> "The King's Bench and Exchequer had properly no jurisdiction over purely civil cases, which were the province of the Common Pleas. But when these two courts became stationary in London, they commenced to poach on the well-stocked preserve—'boni indicis est ampliare iurisdictionem' and virtue was suitably rewarded by court fees."

The civil—nonrevenue—side of the Exchequer prospered because of its simple procedure and rapid process.[89] Actually, of all the common law courts, the Exchequer was perhaps the closest procedurally to the American courts of today. It had the additional advantage of being also a court of equity.[90] The general equity jurisdiction of the Exchequer was later

---

[85] I Holdsworth, op cit 198.

[86] Id 219 et seq.

[87] Id 240; 177 Law Times 404, 406. See the concept explained in II Madox, op cit 189. This invasion began right after 1300 through the royal dispensation given to merchants and others to sue in exchequer and this independent of quominus. II Madox, op cit 15; Radcliffe and Gross, op cit 57.

[88] Carter, op cit 52.

[89] Id 16-17.

[90] I Holdsworth, op cit 240.

regulated[91] and was finally abolished in 1842, when all civil equity jurisdiction was transferred to chancery.[92]

### Import of Historical Review

The import of this historical review is that the Exchequer was not an inferior court and that its remedies of judicial review of tax cases were an integral part of the common law of England in 1776. As one of the three courts of common law, it had equal status with the King's Bench and Common Pleas.[93] Ignoring its revenue activities and referring to the social esteem of its barons, one could say, as Blackstone did, that in the 17th and 18th centuries its civil, nonrevenue side was not held in the same esteem as the other two courts. But it originally was, and always remained, primarily a revenue court.[94] In this area of the law, it was the sole and supreme trial court. For our purposes here the esteem of the civil side is immaterial, except in the context of explaining Blackstone's remark.

Until the Judicature Acts of the 19th and 20th centuries combined the British trial judiciary into a single, high court,[95] the Court of Exchequer exercised its revenue jurisdiction unhampered.[96] The consolida-

---

[91] 57 Geo II, c 18; I Geo IV, c 35; 4 William IV, c 41 § 25; 6, 7 William IV, c 112.

[92] 5 Vic, c 5.

[93] "During the period from the fifteenth to the eighteenth century, the jurisdiction of the Exchequer developed still further. It continued to hear revenue cases as before; its scope as a court of common law was increased, and it established an equity jurisdiction. * * * By the nineteenth century, then, the court of Exchequer had a jurisdiction as extensive at common law as that of the King's Bench or the court of Common Pleas; it also had a special jurisdiction in revenue and equity cases." 177 Law Times 404, 406 (June 9, 1934).

[94] II Madox, op cit 23-4.

[95] I Holdsworth, op cit 638.

[96] *The Attorney General v. Halling, supra.*

tion of equity power in Chancery in 1842 did not destroy the Exchequer's equity powers in revenue cases.[97] Thus, until long after the American Revolution, the Exchequer of Pleas, sitting in revenue cases and exercising common law remedies which blended both law and equity procedures, was an integral part of that English common law system which, in 1843, was adopted as the foundation of Oregon law. *United States F. & G. Co. v. Bramwell, supra.*

## Common Law Reception in America

■ Having established that the Court of Exchequer and its remedies were a part of the common law of England and that its remedies were sufficiently comparable to those in this court to render the remedies of this court remedies known to the common law, the only possible obstacle remaining to the application of these facts to the instant case is the possibility that the common law of England of 1776 adopted in Oregon was not that law as known in England but was some variation of it peculiar to the American colonies at the time of the Revolution. This question appears fully answered by Mr. Justice BEAN in *Peery v. Fletcher, supra,* when he said that our reception of English common law included the statutes of England to 1776. The question is further answered by the realization that the common law of England was not the general law of the colonies in 1776, so that the reception of the English common law throughout the original states was, in fact, a post-revolutionary event.

The early legal procedure in England's American colonies was a mixture of the local law of the English

---

[97] Id.

manorial courts,[98] the courts baron and leet,[99] was in places interlaced with various, religious concepts,[100] and often depended in a particular colony for the amount, if any, of its common law background upon the nature of the colony as a crown colony rather than a proprietorship.[101] Even in the crown colonies, the common law was modified and administered in a single court system.[102] As the colonies matured, the influence of the common law expanded, but it never quite achieved domination of the pre-revolutionary law in America. "Throughout the colonial period it remained

[98] Goebel, op cit.; Haskins, *A Problem in the Reception of the Common Law in the Colonial Period,* 97 Penn L Rev 842 (1949).

[99] Goebel, op cit.

[100] Clover, *The Rule of Law in Colonial Massachusetts,* 108 Penn L Rev 1001 (1960).

[101] For a similar problem, note the letter of Viscount Goderich, Secretary of State for Colonies to Sir James Stirling, Governor of Western Australia, April 28, 1831, in which he said: "\* \* \* it may be proper to notice that Western Australia being a Territory acquired by mere right of occupancy, and not by conquest [true of the American Colonies], the King's Subjects residing there are, by a general principle of Law, entitled to all the Rights and Privileges of British Subjects and carry with them the Law of their Native Country, so far as it is applicable to their new situation and circumstances." Swan River Papers, No. 11, quoted in Clark, *Select Documents in Australian History* 347 (Sydney, 1950) and in *Australia: A Social and Political History,* Gordon Greenwood ed 62 (Sydney, 1955). Note the similarity of rule with the Declaration of Rights of 1774. Ford, op cit.

[102] Under this single court system the infrequently used jurisdictions such as Exchequer were often vested in the colonial governor. Dill, *Colonial Development of the Common Law,* 40 L Q Rev 227-44 (1924). But in the mercantile mind of the 17th and 18th centuries, the creation of colonial courts of Exchequer was entirely possible as being within the royal prerogative.

On June 12, 1738, the Attorney General and Solicitor informed the Lords of Plantations and Colonies that the king had the prerogative of establishing a Court of Exchequer and appointing a Chief Baron in South Carolina. Chalmers, *Opinions of Eminent Lawyers on Various Points of English Jurisprudence Chiefly Concerning the Colonies, Fisheries and Commerce,* 484 (Burlington, Goodrich, 1858). Reference is made to a Court of Exchequer in Barbados. Riddell, *Notes on the Pre-Revolutionary Judiciary in English Colonies,* 11 Can B Rev 317-324, 376-384, 324.

a subsidiary, supplemental law, rivaling and in many
specific matters ousting local institutions, and re-
garded sometimes with veneration and at others with
suspicion and hostility."[103]

The reception of the common law supremely in the
United States had to await nationhood, and then had
to survive the post-war bitterness against English in-
stitutions, overcome the Jacobin influences seeking the
reception of French civil law, and attain realization
through the great burst of American legal scholarship
which, in the early years of our nation, was a part of
our struggle for a coherent, national society.[104] Thus,

---

[103] Radin, *The Rivalry of Common-Law and Civil Law Ideas
in the American Colonies,* 2 Law, *A Century of Progress,* 404, 427
(1937).

[104] Aumann, *The Influence of English and Civil Law Prin-
ciples Upon the American Legal System During the Critical Post-
Revolutionary Period,* 12 Cinn L Rev 289 (1938), on pages 316-17
sums up with the following language: "During this period of
growth a veritable galaxy of pioneer jurists labored to create
our present system of law in the several states. Names like Par-
sons, Shaw, Gibson, Hitchcock, Boyle, Blackford, Sharkey, Martin,
Ruffin, Richardson, Parker, Green, and Williams come to mind
in this connection along with Kent, Story, and Marshall. But the
greatest of these in many respects were Kent and Story. Their
writings were particularly important since they not only gave new
prominence to English legal principles but discouraged the possi-
bilities of a widening influence for French legal principles as
well. Presenting common law principles in a systematic, orderly,
reasoned fashion, their generous citations of French law also
seem to exhaust the resources of the civil law. This manner of
treating the two bodies of principles, undoubtedly strengthened
the American legal thinking along common law lines. It also
tended to turn attention away from demands for an American
Code and help to overcome deep-seated hostility to English legal
institutions as well. 'Had such men as Kent and Story allowed
their good sense to be overcome by the continental philosophers
of law in the Eighteenth Century, whom they undoubtedly ad-
mired,' writes Dean Pound, 'the future of American law might
have been very different.' Whatever that future might have held
will forever remain an interesting speculation, for during the
fruitful years which followed, a common law system was estab-
lished and it has continued in effect to this day. When one con-

although the colonial law was the background against which the reception of English common law occurred, the common law which we received in Oregon was not the direct descendant of the law invoked on the rock at Plymouth or at the mouth of the James River, but instead was the mature common law of mercantile England, which Marshall, Story, and others had expounded and were explaining and expanding as the first settlers broke into the valley of the Columbia.

### Jurisdictional Conclusion

■ As part of that mature common law was a common law Court of Exchequer—a tax court—one of the three great, common law courts—and its procedure for the litigation of the grievances of the citizens concerning the administration of the sovereign's revenue. While the independent existence of such a court was unnecessary in a frontier community, just as it had been in the colonies on the other sea, its remedies lay dormant and available for the future day of need, a part of the common law heritage of the people of Oregon. The fact is that the very sovereign prerogatives which were the basis of the Exchequer jurisdiction in quominus already have been declared a part of our common law heritage. *United States F. & G. Co. v. Bramwell, supra,* at 268-9.

That the common law heritage of this court and the elemental nature of its remedies as a part of our common law heritage falls strangely on the ears of those who before have not had the occasion to consider the genesis and problems of an independent, state tax court is not unlikely. It is not a part of the American,

siders the difficulties and confusion that attended the beginning years of this legal system the achievements of these early workers in the common law take on increased significance."

legal thought to maintain the distinctions between the common law courts and their remedies. Instead, we have lumped them all, including equity, in a single court, often (but not in Oregon) failing to distinguish even between law and equity.

Now Oregon has departed from the single court concept in the field of taxation. By the Oregon Tax Court Act, the legislature has established a new and separate tax court. It has assigned to this court independent, *de novo,* judicial remedies in which the citizen who claims to be over-assessed can litigate the issue of his liability and, if so entitled, have his assessment reduced or set aside. In substance, these remedies are those of the English common law Court of the Exchequer, and were known to the common law. Unlike the statutory, federal, judicial system, the Oregon courts are inheritors of the common law and Oregon courts which exercise a remedy known to the common law are courts of general jurisdiction. The legislature intended that this court be a court of a general jurisdiction exercising all the remedies heretofore vested in the circuit courts in taxation. That it so intended is evident from the act itself, from the various provisions of the act, from the scope of the remedies in this court, from the background of this court in Oregon legislative and judicial history, and from the fact that the legislature, with a clear choice before it, rejected an administrative tribunal with limited jurisdiction for this court with a broad, plenary, *de novo* jurisdiction as a regular part of the judiciary of the state. Since to hold otherwise would result in a constriction of the taxpayer's remedy, contrary to the clear, legislative intent, our history, logic, and the law clearly requires a finding that the remedy in this court is not a special, statutory remedy but is a remedy

known to the common law as modified, but not abrogated, by statute and that this court is a court of general jurisdiction, the successor in Oregon of the ancient, common law Court of Exchequer.

■ In so finding, this court is not unaware that the remedy of mandamus was a remedy of the King's Bench, and not of the Exchequer. *Kendall v. The United States,* 12 Pet 524, 9 L ed 1181, 1219 (1838). However, it is not the import of this decision that the Oregon Tax Court is the Court of Exchequer, but rather that the Court of Exchequer and its *cursus scaccarii* are bases for finding that this court has general jurisdiction and the remedy in this court is a proceeding known to the common law and not a special, statutory proceeding. The forms of the common law have been abolished in Oregon. ORS 11.010; 11.020. A court of general jurisdiction in Oregon, when properly addressed, has the remedies known to all the common law courts. ORS 1.160. The circuit court does not have to distinguish between sitting as Common Pleas or King's Bench. If the remedy lies, it is available in that court as a court of general jurisdiction. Similarly, though the common law ancestor of the Oregon Tax Court was the Exchequer, this court is not restricted to the *cursus scaccarii* but, being a court of general jurisdiction in Oregon, it has available the remedies of the Oregon Tax Court Act and, where these remedies are nonexistent or inadequate, it has the remedies of the common law courts as a whole in cases within its competence as a tax court.

■ Thus, the jurisdictional question is resolved. From the Oregon Tax Court as a whole, from its legislative history, from the clear-cut choice of an independent, plenary court hearing its cases *de novo* over a limited administrative board restricted to a

few specific remedies and merely reviewing the record of an administrative agency, and from the various provisions of the act, we have found that the clear legislative intent, purpose, and objective in the act was to create an expert, plenary, judicial court vested with broad, remedial powers to hear *de novo* all cases, statutory and nonstatutory, including those in mandamus, in the field of income, property, and forest taxation, thereby relieving the circuit court of any burden in this field. We have found that to accomplish this result, the legislature had to create this court as a court of general jurisdiction, rather than as a special, limited, and inferior one, because the latter would have only those remedies expressly created by statute and because all nonstatutory remedies then would be either abrogated or left vested in the circuit court, contrary to the legislative intent. We have found that a court of general jurisdiction is one which exercises common law remedies and that to create this court as one of general jurisdiction the legislature must assign to it common law remedies. Heretofore, the judicial remedies in taxation have been deemed special and statutory and unknown to the common law. We have found that, to imply common law remedies to a court having expressly only special, statutory remedies is improper. Turning then to the common law, we have discovered that, contrary to the general assumption, the plenary judicial remedy of the citizen against the sovereign in taxation was a common law remedy in England in the common law Court of Exchequer at and before 1776. We have found that the common law remedy in taxation was part of the "Common Law of England" of 1776 adopted in Oregon in 1843 and that it has lain dormant as part of our fundamental law to become now available in support of the legislative pur-

pose of this act. We have found that because the tax remedy was a common law remedy, the legislative assignment of that remedy, modified by statute as have been all common law remedies, to the Oregon Tax Court can be relied upon to make this court a court exercising remedies in the course of the common law and, therefore, a court of general jurisdiction in the field of income, property, and forest taxation, which carries out the clear legislative intent, purpose, and objective of the Oregon Tax Court Act. As such a court of general jurisdiction, this court has the power to exercise the common law remedies not only of the *cursus scaccarii* but also those of the other common law courts because the distinction between the forms of actions and the common law courts has been abolished in Oregon. Among those powers is the power to issue the writ of mandamus. Faced as this court is here with a case within its competence in income, property, and forest tax law but for which no plain, speedy, and adequate remedy is provided by the statutory procedures, this court is empowered as a court of general jurisdiction to act under ORS 1.160 to provide a remedial procedure appropriate in this case. Clearly, mandamus is such procedure and will lie. Therefore, this court has the power to issue the writ and mandamus properly lies in this court in this case.

Having determined in the affirmative the first two, major issues set forth above, that mandamus will lie and that this court, being a court of general jurisdiction, exercises the remedies in taxation known to the common law, including the provisional remedy of mandamus, there alone remains the third major question of whether, on the facts of this case, the writ should issue.

## HOME RULE QUESTION

This substantive question boils down to whether or not ORS 310.400 is applicable here and required the ballot measure for the levy in question to be stated in dollars and cents.

### Facts

The levy sought to be extended on the assessment and tax rolls was for an amount not exceeding four mills of the assessed value in the city to provide street lighting within the city. The defendant contends that the levy was invalid because it did not state the amount in dollars and cents. The actual wording of the ballot was:

"ANNUAL TAX LEVY FOR STREET LIGHTS
Purpose: To authorize annual street light tax levy, beginning fiscal year 1962-63, and not exceeding four mills per dollar of taxable property in the City of Woodburn.
"Question: Shall the Woodburn City Charter be amended as provided in Ordinance No. 1052 to accomplish the above purpose?"

No other question is raised as to the election or the levy and all other proper procedures appear to have been followed.

### Applicability of ORS 310.400

This case does not present a question of constitutionality. Instead this issue requires interpretation of the constitution to determine whether by its own terms ORS 310.400 applies in this case. ORS 310.400 reads:

"310.400 Any proposed tax levy, whether a continuing fixed levy, continuing levy, or levy for a single year, submitted to a vote of the people by the state, any county, municipality, district or body to which the power to levy a tax has been delegated

shall be stated in dollars and cents in the measure to be voted upon, and not otherwise, notwithstanding any provision of any other statute of this state to the contrary, and *where not inconsistent with or otherwise provided for in the Constitution of this state.*" [Emphasis supplied.]

The plaintiff contends that ORS 310.400 is inconsistent with Article XI, section 2, of our Constitution, the city home rule provision, which reads:

"Section 2. Corporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws. The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, *subject to the Constitution and criminal laws of the State of Oregon,* and the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon." [Emphasis supplied.]

The issue presented by this contention has been determined to a great extent in *State ex rel Heinig v. Milwaukie,* 231 Or 473, 373 P2d 680 (1962). In that opinion by Mr. Justice O'CONNELL, the court held "that the legislative assembly does not have the authority to enact a law relating to city government even though it is of general applicability to all cities in the state unless the subject matter of the act is of general concern to the state as a whole, that is to say, that it is a matter of more than local concern to each of the municipalities purported to be regulated by the enactment." 231 Or at 479.

The opinion goes on to point out that "uniformity in itself is no virtue" and is not alone sufficient ground for legislative pre-emption. The paramount issue in each case is whether the subject matter of the statute is of state or local concern. Since some activities sought to be regulated by state law cannot be classified within one or the other category of concern, but partake of both, with one or the other predominating, the predominant characteristic is determinative.

In the end, however, the determination of which interest or concern is paramount must be made on the facts of each case.

"* * * Each case requires a weighing of the state's interest against the interest of the municipality. In some instances the need for uniformity, or the benefit of a widespread application of the law, or the recognition that the matter dealt with is interrelated with other functions of the state and similar considerations will require that the statute have preference over the charter; on the other hand the charter will prevail when the advantages of local autonomy are paramount." 231 Or 488.

In the *Heinig* case, one criterion used was whether the effect of the city activity extended beyond the city limits. Involved was a state law requiring civil service for firemen. Though the firemen acted outside the city occasionally, the court held the state law invalid. It recognized that standardization of hose couplings might be a state concern so that Milwaukie hoses could be used in Portland or Canby in an emergency, but it held that firemen's uniforms and their employment and discharge were of local concern.

■ Applying here the rules so recently announced by our Supreme Court, it is clear that a failure to set

forth the levy in dollars and cents, if it adversely affects anyone, so affects only the residents of Woodburn. Only these residents had the right to vote. Only they had the burden of paying the tax.. Certainly, persons outside Woodburn had no more concern with this ballot than did the people outside Milwaukie with the civil service of Milwaukie's firemen. Thus, the content of the ballot had only local concern and ORS 310.400 is inconsistent with Article XI, section 2, of the Oregon Constitution and, by its own terms, does not apply to charter amendments of "home rule" city charters. This conclusion is in line with *Pearce v. Roseburg,* 77 Or 195, 208, 150 P 855 (1915), which held: "City taxation is entirely a local matter with which the people of the state at large have no concern."

The only case which limits or confines the ruling in *State ex rel Heinig v. Milwaukie, supra,* is the very recent case of *Boyle v. City of Bend,* 234 Or 91, 380 P2d 625 (1963), handed down on April 10, 1963. This case does not appear to limit the application of the *Heinig* case in the factual situation before this court in this case. The *Boyle* case held that the protection of the rights of a group of citizens of a city separated from the citizens as a whole for the purposes of a special assessment was a matter of general concern, not local concern. This conclusion can readily be distinguished from the case at bar. In the *Boyle* case, the state statute in question merely provided a judicial remedy by which the taxpayer could question the validity of the special assessment and did not prohibit the city from adopting a recognized procedure in approving the levy of a tax by the people. By the *Boyle* decision, the court recognized the right of the state to protect small groups of citizens from arbitrary action by their cities. In effect, it said that the state has at

least the right if not the duty to provide such protection. In the instant case, all the citizens were equally affected and protected and they all acted in their corporate capacity. Even beyond this, they had the right to vote aye or nay. There was no element of minority rights involved.

In a footnote (footnote 6 on page 98), the court in the *Boyle* case sought to limit the application of the *Heinig* case to the situation in which the state statute conflicted with an ordinance. That is the case here. The Woodburn Common Council passed an ordinance authorizing and directing the ballot measure to be presented in mills rather than dollars and cents. ORS 310.400 conflicted with this ordinance.

In the *Boyle* case, the court expressly recognizes a municipal tax levy as being of local character and concern. (234 Or 98) It does not deny, but rather affirms, the predominant local concern in this area. What it carves out of this field as being of general concern is merely the assurance of judicial due process in special assessments. It does not say that the legislature has the right to control the procedure for establishing a special assessment. What it does say is that "the legislative assembly had the power to guarantee to the property owner the protection afforded by traditional court procedure, including a trial by jury * * *." This is far different than, and clearly distinguishable from, the power contended for in ORS 310.400, the power to proscribe and prescribe certain details of the establishment of the tax levy as a whole. The *Heinig* and *Boyle* cases read together appear to be clear authority for the validation of the instant levy and for the conclusion that ORS 310.400 did not apply here because it is inconsistent with city home rule.

*Woodburn Charter Provisions*

■ Ordinarily, the foregoing conclusion would dispose of this case, but here the city charter of Woodburn provides in its Chapter II, section 3, as follows:

"ELECTIONS—LAWS GOVERNING. All the laws of this state regulating and governing general elections and proceedings and matters incidental or relating thereto or connected therewith shall apply to and govern elections under this charter, * * *."

and this language raises the question of whether ORS 310.400 applies by virtue of the city charter.

ORS 310.400 was enacted in 1953. Oregon Laws 1953, ch 133, § 1. Though it is not clear in this record when Section 3 of Chapter II of the Woodburn charter was enacted, it was in effect in 1942 when the charter was compiled under the Bureau of Municipal Research and Service and appears to have been part of the original charter.

Since this provision appears in the charter rather than in an ordinance, we are not concerned with a problem of improper delegation of a legislative function. By Article XI, section 2, of the Oregon Constitution, the home rule power was conferred by the people upon the people living in incorporated municipalities, and, clearly, under the Woodburn charter, the people of Woodburn can transfer back some of that power to the people of the state to be exercised through the legislature. Here the people of Woodburn did transfer back the right to control their election procedure, raising the question of whether ORS 310.400 is included within the charter language of "all laws of this state regulating and governing general elections and proceedings and matters incidental or relating thereto or connected therewith."

It is argued by the city that only the laws compiled under ORS Title 23, Elections, governing general elections are intended to be adopted by Chapter II, section 3, of the charter. Obviously, only the general election laws are adopted, as opposed to the entire title, because the primary election laws pertain to partisan, nominating elections and are not applicable to cities; but, since the elections to which ORS 310.400 could apply include general elections, as well as primary and special elections, this limitation to general elections is not clearly determinative. Counsel for the city urges upon the court also, as of minor persuasion, the administrative interpretation that has been made by the Secretary of State to exclude ORS 310.400 from the election laws as published by that official.

The city's position is supported by the general concept of a charter as the grant of power by the people in the nature of a constitution and the rule that such grants are to be strictly construed. *Richards v. Portland,* 121 Or 340, 345, 255 P 326 (1927). As stated by Mr. Justice ROSSMAN in *Fisher v. City of Astoria,* 126 Or 268, 269 P 853 (1928), at page 281:

> "* * * this court, in accord with the general rule, has held that such powers only are conferred as are clearly comprehended within the words of the act, or are included therein by necessary implication, and that any fair, reasonable doubt as to the existence of the power will be resolved against the municipality [Citations omitted.]."

This latter case involved the assessment of local improvements and noted that these proceedings are *in invitum,* warranting strict construction. It is closely related to the instant case.

The foregoing cases deal with the legislative power conferred by the people through the charter upon the

city council. In the instant case, we have the analogous situation of the people conferring by charter a legislative power upon another body, the state legislature. If the power of the elected city council must be express and is strictly construed, it would appear that an even stricter construction should be placed upon the grant of legislative power to a body which the people who are taxed do not elect and which is beyond the vote or recall of those people.

Turning to the language of the charter, the state laws that are adopted are those "regulating and governing general elections and proceedings and matters incidental or related thereto or connected therewith." It is indeed a close question as to whether the charter language includes all laws applicable to all matters which may be voted upon at a general election or merely includes either those laws specifically applicable to general elections, as opposed to primary and special elections, or those laws generally applicable to the mechanics of general elections and the proceedings and matters which lead up to and follow the actual balloting. If the former broader interpretation is proper, then ORS 310.400, dealing as it does with the form of the ballot to be used in levy increase ballot measures, applies here. On the other hand, ORS 310.400 does not apply generally to elections. Furthermore, it was not a part of the state law when the charter was adopted and could not, therefore, have been in the contemplation of the grant of legislative power then made. A perusal of the charter discloses that various amendments have been made using the "millage" language used in this case. If either of the narrower interpretations of the charter language is used, ORS 310.400 would not apply because it is not a statute of general application to general elections

and it does not apply either to the mechanics of election or to general elections, as opposed to primary or special elections.

As noted before, the question here involved is a close one. In the case of a purported grant of power to the city council, the cases deny the existence of the power where there is a fair and reasonable doubt. *Fisher v. City of Astoria, supra.* Where, as here, there is no control over the legislative power by the people to be taxed, it is held above that even a stricter rule appears justified. There is a doubt as to the grant of the power back to the state legislature. The doubt is based upon two reasonable and conflicting interpretations. A doubt so based would appear to be "fair" and "reasonable." The conflicting interpretations, in any event, do not make the grant of authority "clearly expressed." Therefore, the doubt must be resolved against the grant and ORS 310.400 must be deemed inapplicable to city elections under the Woodburn charter.

■ This court finds that the Woodburn charter does not adopt ORS 310.400 as part of the city's election laws and that, being inconsistent with the home rule provisions of the Oregon Constitution, ORS 310.400, by its own terms, is inapplicable here. Consequently, the defendant, in following the order of the commission, was in error in not extending the city's street light levy. This court further finds that no statutory remedy was available to the city to redress its grievance, that the writ of mandamus is a proper remedy, and that, being a court of general jurisdiction administering a remedy known to the common law, this court has jurisdiction to issue this writ of mandamus.

Based upon the law and facts herein presented, the decision of this court is that the alternative writ

shall be made peremptory. An appropriate judgment and writ shall be presented as in the case of a decree under rule 32 of this court.* †

---

\* On May 2, 1963, the court added an addendum with the following note:

"After the opinion in this case was written but before it was released, the Supreme Court handed down the opinion in *Boyle v. City of Bend,* 76 Adv Sh 535 (1963), which this court considered but upon which it did not think comment was necessary. Upon more mature reflection, it appears that this recent case should have been mentioned and distinguished in this decision. Therefore, this court, on its own motion, adds to this decision the following three-paragraph addendum, which in the printed opinion will be added after the second paragraph of page 74 of the original opinion (first paragraph of page 342 of the Advance Sheets.)"

† Foregoing case appealed. Oregon Supreme Court opinion found in 238 Or 401, 395 P2d 150 (1964).